160 So.2d 496

J. C. Doyle **WHITE**

v.

**STATE.**

**6 Div. 973.**

Court of Appeals of Alabama.

Jan. 28, 1964.

H. C. Orme, Jr., Gadsden, for appellant.

Richmond M. Flowers, Atty. Gen., and W. Mark Anderson, III, Asst. Atty. Gen., for the State.

CATES, Judge.

White was indicted for the second degree burglary of Holly Pond High School. On a verdict of guilty the trial judge sentenced him to eight years in the penitentiary.

The only evidence was that adduced by the State. It was all circumstantial except possibly the testimony of a Holly Pond policeman, Pasco Pete Patterson.

Patterson, about 7:30 on the morning of October 12, 1962, was afoot searching some woods about two miles northwest of the school. Some five or six hours earlier the school principal, through some sort of listening device running from the school to his house, overheard voices and loud noises.

Some two or three hundred yards from a "regularly travelled road" Patterson found White and another, D. C. Green. Green "had on green work trousers."

A green and white two-tone hardtop 1955 Chevrolet two door sedan with Etowah County tags was found by the deputies early in the morning in a cemetery about a half mile north of the school. White was the registered owner. A State investigator testified he verified the number of the car's engine with that given on the license receipt.

The sheriff, answering a call from the principal, saw, as he drove up, two men running in the area on the south side of the schoolhouse heading south toward Holly Pond. This was about 2:20 A.M., October 12, 1962.

Tracks—footprints fresh on the morning dew—led from the Chevrolet to within thirty or fifty yards of the school on the north. On the south the tracks led out from the schoolhouse door for one hundred to one hundred fifty yards.

The sheriff's testimony on direct was in part:

"A There was a small driveway with grass in it and a few feet behind the door, then it ran into an area that had been plowed and a garden into where it was growed up in weeds, vines and briars that had been there for years, and there were honeysuckle vines knee deep to waist deep in there.

"Q From that area south of the school, did you continue your investigation?

"A Yes.

"Q Did you follow the tracks leading south from the school?

"A Into these vines and weeds.

"Q How far from the school was this point you followed these tracks approximately?

"A Maybe 100 or 150 yards in the weeds where they had been trampled down.

"Q Could you follow the tracks clearly?

"A Where the ground was soft in the area of the garden you could, when they got into the vines you could see where something had gone through.

"Q Did you continue your investigation of the tracks?

"A Yes.

"Q Where did you find them next?

"A Back north near the automobile coming out of the pasture off a bank into this cross road that goes east and west.

"Q These two sets of tracks?

"A Yes.

"Q Did you follow them from the area?

"A Yes.

"Q Which way did they go then?

"A They led across the little dirt road, the cross road, in a direction from the cemetery going east and west into a weed patch. You couldn't do too much with it, you would see a track once in a while in the cotton field and the tracks led into the north direction around the woods, they were going in and out very much, they would go in deep, what I call a deep, hilly place and the tracks would go and they stayed around the edge of the woods.

"Q In which general direction were they going?

"A In a northwesterly direction.

"Q In your judgment how far did you follow them in a northerly direction from the cemetery?

"A I would say two miles, or further.

"Q Do you know Mrs. Fannie Mae Lovell and where she lives out there?

"A Yes.

"Q Did you follow the tracks towards where her house is or not?

"A In the general direction, they were going towards her house.

"Q Do you have any judgment about how close to her house you followed them before losing them?

"A I would say one-quarter of a mile."

Mrs. Lovell testified that she lived two and a half miles north of Holly Pond on the Holly Pond-Fairview Road. The morning of October 12 she got up around five o'clock. About six in the morning she saw two men walking south on the road. Both were bareheaded and one wore dark green trousers.

Mr. Hollis Tucker, the principal, as well as the sheriff described a broken window, office doors left open, a vault broken in with concrete blocks beaten to make a hole, the combination lock on the vault door off and debris of the concrete blocks and the cement mortar.

Mr. Tucker testified the walls, including those in the vault, were painted "a greenish-blue or bluish green." Typewriters, adding machines, desks and chairs were being kept in the school building. The Cullman County Commission on Education had "general care and overall supervision of the High School."

A toxicologist testified that clothes, notably a shoe (shown to have come from White), contained small fragments of concrete. On one fragment, he found "small flakes of light green paint." He also gave the opinion that (and demonstrated to the jury) the shoe made tracks identical with two found at the scene.

The investigator had poured plaster of paris into at least two of the footprints. The resulting casts were in evidence along with White's shoe.

Mr. Tucker, on leaving at 5:00 P.M. of the day before, had seen that all the building's windows and doors were locked.

### I.

The indictment follows the Code form, T. 15, § 259, Form 32. It lays the charge in a single count:

"The Grand Jury of said County charge that before the finding of this Indictment J. C. Doyle White, alias Jaybird White, whose name is otherwise unknown to the Grand Jury, did, with intent to steal, break into and enter a shop, store, warehouse, or other building, to-wit: Holly Pond High School, of the Cullman County Commission of Education, which is specially constructed or made to keep goods, wares, merchandise or other valuable thing, to-wit: desks, typewriters, chairs, adding machines, in which goods, wares, merchandise or other valuable thing, to-wit: desks, typewriters, chairs, adding machines, were kept for use, sale or deposit, against the peace and dignity of the State of Alabama."

The only grounds of demurrer which need discussion are:

"9. That said indictment fails to allege the legal description of 'Cullman County Commission On Education.'

"10. That said indictment fails to allege whether or not 'Cullman County Commission On Education' is an individual, partnership, corporation, agent, agency or other legal title description."

Appellant's brief states in part:

"For all that appears in the indictment, the accused may have been the actual, if not the legal, custodian of the building described as the 'Holly Pond High School', or the room or office broken into and entered may have been in the actual custody of the accused.

"To illustrate, the evidence in the record shows that Mr. Tucker is principal of the school occupying the office that was broken into and entered in Holly Pond High School. Suppose he had broken and entered his own office. There is not evidence in this record that anything of value or anything at all was taken from the office or building. Could Mr. Tucker be guilty of burglary under such circumstances?

"It cannot be doubted that each room or office of the Holly Pond High School may be a 'building' within the meaning of the statute, and the subject of bur-

glary, but the ownership of the property in such a prosecution should be laid in the actual occupant. Adams vs. State [13 Ala.App. 330, 69 So. 357].

" * * * The undisputed proof and only proof offered by the State as to ownership is the testimony of Mr. Hollis Tucker, the principal of Holly Pond High School. In reply to the question 'Who has the general care and overall supervision of the High School out there?' He stated 'The Cullman County Commission on Education, the Board of Trustees and the principal.' * * * "

■ Burglary is, in part, against possession. Aiola v. State, 39 Ala.App. 215, 96 So.2d 816, headnote 2.

■■ Charging ownership in a burglary count puts the onus on the State of showing "ownership," i. e., occupancy—rather than title. The person in possession (either himself or by servant) is the occupant for this purpose. Key v. Dozier, 252 Ala. 631, 42 So.2d 254, adopting Fuller v. State, 28 Ala.App. 28, 177 So. 353, which, in turn, relies on Adams v. State, 13 Ala.App. 330, 69 So. 357, where Judge (later Mr. Justice) Brown wrote:

"The rule which requires the negation of the defendant's right to break and enter necessitates that the ownership of the property be definitely laid in the indictment. * * * The reason of the rule is to show that the accused is not the rightful occupant, and therefore had no right to break and enter, and to so identify the offense on the record as to protect the accused from a second prosecution for the same offense. State v. Trapp, 17 S.C. 467, 470, 43 Am.Rep. 614."

A number of Alabama cases are collected in 20 A.L.R. (Anno.) 510, with the following statement of the rule of the majority of American courts:

"By the great weight of authority an indictment or information for burglary must allege directly the ownership of the building entered.

"*Alabama.*—Ward v. State (1874) 50 Ala. 120; Beall v. State (1875) 53 Ala. 460, 2 Am.Crim.Rep. 463; Graves v. State (1879) 63 Ala. 134; Adams v. State (1915) 13 Ala.App. 330, 69 So. 357. See also Anderson v. State (1872) 48 Ala. 665, 17 Am.Rep. 36; Webb v. State (1875) 52 Ala. 422; Johnson v. State (1883) 73 Ala. 486 [483]; Arp v. State (1893) 97 Ala. 5, 19 L.R.A. 357, 38 Am.St.Rep. 137, 12 So. 301, 9 Am. Crim.Rep. 517."

And supplemented in 169 A.L.R. (Anno.) 887:

"*Alabama.*—Wilson v. State (1945) 247 Ala. 84, 22 So.2d 601 (denying writ of certiorari in (1945) [32] Ala.App. [127], 22 So.2d 600); Jetton v. State (1939) 29 Ala.App. 134, 195 So. 283 (writ of certiorari denied in (1940) 239 Ala. 306, 195 So. 284)."

■■■ A corporation, being persona ficta, an artificial being, exists, in legal theory, only through the acts of its alter ego or its agents, servants, employees, officers or directors which can be attributed to it. A building which is corporate property—not occupied by another—may be the subject of second degree burglary with the averment of possession laid in the corporate name. Cf. Vines v. State, 37 Ala.App. 22, 69 So.2d 475. Aldridge v. State, 88 Ala. 113, 7 So. 48, cited as authority for text, 4th sent. 9 Am.Jur., Burglary, § 49, fn. 3.

Thus a former rule we find stated in Johnson v. State, 73 Ala. 483, per Brickell, C. J.:

"There must, however, have been evidence to support the averment of ownership. The fact of the incorporation of the Louisville and Nashville Railroad Company, under the laws of the State of Kentucky, must have been shown to satisfy the averment. To prove the ownership, the same character and degree of evidence which would

be necessary in a civil action, at the instance of the company for the injury to the car, is necessary. The fact of incorporation must be shown, and when that is derived from a statute, of which the courts do not take judicial notice, the statute must be produced.— Ang. & Ames on Cr. § 632."

But now it is necessary for the defendant to file the rough equivalent of a plea of nul tiel corporation. Code 1940, T. 15, § 315, provides:

"§ 315. In the trial of criminal cases it shall not be necessary for the state to prove the incorporation of any corporation mentioned in the indictment, complaint, or information, unless the defendant within thirty days after indictment, if defendant be under bond, or within thirty days after arrest on capias, denies the existence of such corporation by a sworn plea."

No such plea was filed in this case.

■ We judicially notice Act No. 18 of February 17, 1955, creating the Cullman County Commission on Education. Cf. Code 1940, T. 15, § 243; Frost v. State, 153 Ala. 654, 45 So. 203. This body has the powers and duties of a county board of education.

Turk v. Monroe County Board of Education, 222 Ala. 177, 131 So. 436, characterizes a county board of education as a quasi corporation. It has succession beyond the natural lives of the corporators or members. We quote from Cyclopedic Law Dictionary, 3rd Ed., p. 914:

*"Quasi Corporations.* A term applied to those bodies which, though not vested with the general powers of corporations, are yet recognized by statutes or immemorial usage as persons or corporations aggregate, with power to sue and be sued in their aggregate capacity. 2 Kent, Comm. 274; [Mower v. Inhabitants of Leicester] 9 Mass. 247; [Adams v. President, etc., of Wiscasset Bank] 1 Me. 361.

"A body having capacity to make contracts in respect to county affairs, and having perpetual succession, is a quasi corporation ([Levy Court v. Coroner of Washington County] 2 Wall. [U.S.] 501, e. g., the overseers of the poor ([Rouse v. Moore] 18 Johns [N.Y.] 407)."

Noojin v. State, 29 Ala.App. 178, 194 So. 414, held the expression "of the State of Alabama" could not be taken by judicial notice to mean that the schoolhouse at Ruhamer was owned by a public agency. Indeed, there is language to the effect that— whatever else it may be, territory, people, intellectual abstraction or myth—the State is not a corporate body.

■ Unless otherwise stated in the Constitution, the Legislature controls the use of public property which is free from trust. Cf. Cons. § 258, as amended. 81 C.J.S. States §§ 104 and 105. Finch v. State, 271 Ala. 499, 124 So.2d 825; Smith v. Duke, 257 Ala. 86, 57 So.2d 550; Hanna v. Sunrise Recreation, Fla., 94 So.2d 597.

■ Under Code 1940, T. 52, §§ 71 and 99, our Legislature has made the county board of education the owner of legal title to school property, except in cities having city school boards. This is an active trusteeship not mere nominal ownership.

■ The principal is a teacher who is the chief executive officer and head of the teaching faculty of a particular school. Code 1940, T. 52, § 351. Boody v. School Committee, 276 Mass. 134, 177 N.E. 78; McDevitt v. School Committee, 298 Mass. 213, 10 N.E.2d 100; Downey v. School Committee, 305 Mass. 329, 25 N.E.2d 738; Clark v. Beverly, 257 Ala. 484, 59 So.2d 810.

Of a principal's mandamus action to resist transfer to teaching duties, the Massachusetts court in McDevitt v. School Committee, supra, said:

"* * * This is not like cases where an officer is elected to a particular of-

fice with permanently fixed duties for an established term."

Therefore, we consider the claimed occupancy of the building by the principal to be that of one acting for the county school board—here called Commission on Education. The principal is the mere agent or servant of the Commission. Delegatus non potest delegare.

In Adams v. State, 13 Ala.App. 330, 69 So. 357, and Norman v. State, 13 Ala.App. 337, 69 So. 362, it was held proper to aver that "ownership" of the premises was in the State Health Officer. He was commissioned by law. Here the Cullman County Commission was also thus charged.

We have two elemental principles which affect both allegata and probata in this case.

■ *First*, at common law, burglary was the breaking and entering in the nighttime of a mansion house, i. e., an inhabited dwelling, with intent to steal or commit felony. Therefore, our statutory second degree burglary having no common law antecedent must be strictly construed within the words used.

*Second*, not all parts of public buildings can be thought of as being closed to the public. Consent to enter lobbies, corridors and waiting rooms on public business there conducted at reasonable hours may be implicit.

Conversely, for the protection of public property and personnel after working hours, the legal custodian of a public building would seem to have the inherent power to regulate the coming and going of visitors.

■ When we combine these two concepts by adverting particularly to Code 1940, T. 14, § 86, we note that the use to which the particular "apartment," office, or suite of offices in a public building is put determines whether or not there is second degree burglary.

The open corridors, lobbies and vestibules in a public building, such as a post office, may be open at all hours to the general public and yet various rooms containing furniture, working files, etc., may be behind locked doors. A breaking and entering of the stamp cage in a post office should not be palliated by the fact that the front door and the lobby of the building were open. Quinn v. State, 39 Ala.App. 107, 95 So.2d 273 (particularly defendant's confession p. 110 of 39 Ala., p. 275 of 95 So.2d).

Though the Georgia statute uses somewhat different expressions, yet the reasoning of the Court of Appeals in Davenport v. State, 27 Ga.App. 284, 108 S.E. 131, and in Stinson v. State, 65 Ga.App. 592, 16 S.E. 2d 111, is apt. We quote from the Stinson opinion:

"MacIntyre, Judge.

"The motion in arrest of judgment was made on the grounds * * * that the indictment alleges that a public school was broken into and entered, and that under the law of Georgia it is not burglary to break and enter a public building with intent to steal, unless it is alleged that the building was broken and entered at a time when the public was not entitled to be in the building; * * *

" * * * We think this case comes clearly within the rule in Davenport v. State, 27 Ga.App. 284, 108 S.E. 131, as follows: 'The words "place of business," as used in the statute defining burglary, mean any house occupied as a place of business by another, in which valuable goods are contained, and this is so regardless of whether such place of business be located in a private or public building.' * * * *"

In the Adams and Norman cases, the State Health Officer having a suite of offices with a locked door was held to be the person in possession for the purpose of pleading and proof.

These two cited cases indicate the particular need for the protection of the burglary statute extending to quarters used for

public business. The purpose of the defendant's breaking and entering was to substitute presumably more correct answers in a medical entrance examination. After the employees and officers using the premises have left for the day or on holiday, certainly it is in the public interest that the general public be denied access to such offices under the penalty of second degree burglary for breaking and entering for an illegal purpose.

Hence, the demurrer to the indictment was properly overruled and there was sufficient proof of (1) the Commission's being in actual occupancy through the school principal and (2) the building's being put to a protected use.

Also, the jury had before it no issue on the corporateness of the Cullman County Commission on Education because (1) there was no plea under T. 14, § 315, supra, and (2) the court, ex mero motu, would have had to have dismissed such a plea since judicial notice is required of public statutes. Code 1940, T. 15, § 243; Albrittin v. Mayor, etc., of City of Huntsville, 60 Ala. 486; Wigmore, Evid. (3rd Ed.), § 2572.

## II.

### Charges on Circumstantial Evidence

The trial judge refused to give charges 1, 2, 3, 4, 9, 12, 13, 14 and 15 which the defendant tendered him in writing.

Charges 1 and 2 were affirmative in nature, thus their refusal tested the sufficiency of the evidence. The court correctly refused them.

White's charge 3, refused, reads:

"To justify a conviction of crime on circumstantial evidence alone, it must be inconsistent with any reasonable theory of innocence."

This charge 3 was held good in Pickens v. State, 115 Ala. 42, 22 So. 551 (charge 42), and in Bowen v. State, 140 Ala. 65, 37 So. 233, but was refused without error in McCoy v. State, 170 Ala. 10, 54 So. 428 (charge 5), and Bailey v. State, 168 Ala. 4, 53 So. 296 (charge 14a). In McCoy and Bailey the refusal was proper because the evidence was not wholly circumstantial.

We see no error in refusing charge 3 tendered below. The trial judge, in his general charge, stated (among other things):

"* * * The test of sufficiency of circumstantial evidence is whether circumstances produce moral conviction beyond reasonable doubt of the accused's guilt and are incapable of explanation on any reasonable hypothesis consistent with innocence."

The trial judge gave a number of charges at the defendant's request. Of these, charges 7, 8 and 10 particularly cover various phases of the concept of the measure of proof under, and office of, circumstantial evidence.

Thus, given charge 7 is virtually a verbatim copy of charge 4 in James v. State, 22 Ala.App. 183, 113 So. 648. The judge gave defendant a lagniappe in charge 8: it is charge 14 criticized in Jarrell v. State, 255 Ala. 128, 50 So.2d 774. A like bonus was in given charge 10. See Jones, Ala. Jury Instructions, § 6119, listing at footnote 19 cases not requiring this charge.

This quoted portion of the oral charge is excerpted, though without the clause as to the duty to acquit, from refused charge 33 in Way v. State, 155 Ala. 52, 46 So. 273. In Haygood v. State, 252 Ala. 3, 38 So.2d 593, the defendant's charge 31 was treated as the equivalent of charge 42 in the Pickens case, supra.

Since neither this latter charge (42 of Pickens) nor White's refused charge 3 contains a conditional direction to acquit, we think the court below, in the above quoted language, self-evidently and under the reasoning in Haygood, supra, gave the jury the identical idea phrased in refused charge 3.

258

In Holman v. State, 36 Ala.App. 474, 59 So.2d 620, our late lamented Presiding Judge Carr said:

" 'The sea of suspicion has no shore, and the court that embarks upon it is without rudder or compass.' "

Charge 4 was refused without error. In its oral charge, the court instructed that the presumption of innocence accompanies the defendant until the minds of the jury are convinced by the evidence beyond a reasonable doubt, etc. The judge also defined reasonable doubt in approved terms. Also, he stated, "Circumstantial evidence, if it merely arouses suspicion, is insufficient to support a conviction."

■ Refused charge 9 was verbatim charge 1 in Bowen v. State, supra. The theory that some other person did the deed is misleading where, as in the case of instant concern, there is a tendency of the evidence to show that the defendant had accomplices. Ex parte Hill, 211 Ala. 311, 100 So. 315; Skumro v. State, 234 Ala. 4, 170 So. 776 (charge K).

The giving of charge 7—from charge 4 in James v. State, supra—removed any need for refused charge 12.

Charge 13 refused comes from Gilmore v. State, 99 Ala. 154, 13 So. 536, charge 6 (Jones, op. cit. supra, § 6107). In the light of the court's having given defendant's requested written charge 8, any error in refusing charge 13 would seem academic. Sup.Ct. Rule 45.

Charge 14, relating to the defendant's not testifying, was covered by the general charge.

■ Having given charge 16, i. e., "the defendant is under no obligation * * * to explain his presence near Holly Pond School at the time of his arrest," the court will not be put in error for refusing its variant, White's requested charge 15. Code 1940, T. 7, § 273.

III.

Was White Compelled to Testify?

■ White would invoke Constitution 1901, Declaration of Rights, § 6, " * * * and he shall not be compelled to give evidence against himself, * * *." This claim is put in his brief thus:

"On direct examination of Mrs. Lilly May Lovell, a witness for the State, she was asked by the Solicitor 'Look at the defendant sitting behind his attorneys, do you recognize him?' (Tr. 84). At the time this question was asked the Solicitor pointed to the defendant and it is our conscientious belief that such action and question was highly improper and prejudicial to the defendant and that the motion for a mistrial should have been granted the defendant. In our humble opinion such action had the same effect as if the Solicitor had asked the defendant to stand in Court * * *"

In Wells v. State, 20 Ala.App. 240, 101 So. 624, reversible error came from the court's ordering the defendant to stand so a witness could say whether or not "he was about the size and build of the man that did the shooting that night."

In the case of Smith v. State, 247 Ala. 354, 24 So.2d 546, we find a unanimous court, per Foster, J., saying:

"On several occasions during the examination of witnesses, the defendant being in court, and to enable the witnesses, respectively, to see him better for the purpose of identification, he was told by the solicitor to stand up. There was objection made, overruled and exception noted. He obeyed such request or demand of the solicitor. Did this violate his constitutional right not to be compelled to give evidence against himself? Section 6, Constitution. Although there is much contrariety of opinion on the subject, (14

Amer.Jur. 875, section 15; 22 Corpus Juris Secundum, Criminal Law, § 652, p. 999; 16 Corpus Juris 568), this Court, in denying certiorari in Wells v. State, 211 Ala. 616, 101 So. 626; Id., 20 Ala.App. 240, 101 So. 624, has approved the strong stand taken by the Court of Appeals in holding that there was error in such a ruling * * *

\* \* \* \* \* \*

"While his identity is here in question, * * * that question is foreclosed in Alabama by the Wells case, supra. * * *

\* \* \* \* \* \*

" * * * we think that when an accused is illegally required in court to stand up for inspection of his person, and this is against his will and over his objection, when he has not previously submitted himself as a witness, the fact that he later takes the stand voluntarily as a witness, denying all connection with the crime, and thereby submits himself to inspection, is not a waiver of the wrong previously done him, when he has made due objection and excepted to the ruling of the court. * * * "

But we consider the Smith case should mark the boundary of reversible error under this constitutional privilege. Otherwise, it would carry us to the absurdity that a defendant could choose to stay away from his own trial. See McCullough v. State, 40 Ala.App. 309, 113 So.2d 905.

In Luker v. State, 39 Ala.App. 548, 105 So.2d 834, we find Mr. Justice (then Presiding Judge) Harwood saying:

"The above excerpt clearly shows that the court acted only to have Hon. Frank G. Horne, one of the defense counsel, move, in order to permit and make more certain the identification of the appellant by the prosecutrix. We find nothing in this occurrence that could rationally be construed as forcing the appellant to testify against himself."

The form of the question, by assuming the defendant to be the man sitting behind the attorneys, was probably improper. But the question was withdrawn.

Though the asking may have been error under Campbell v. State, 32 Ala.App. 461, 27 So.2d 220, this was not a ground of objection. Cf. Circuit Court Rule 33 and cases.

Under Luker the State has the undoubted right to ask a witness if he or she can identify or recognize the person previously seen from those in the courtroom.

That the solicitor leads the witness may be the solicitor's giving evidence. But for the accused to give evidence he must be said to have been required to give a physical response. Wigmore, Evid. (3rd Ed., McNaughton, rev. 1961), § 2265.

The incident, if error, was without injury under Supreme Court Rule 45.

IV.

Judge's Remarks as Comment on Evidence

The following exception was reserved at the close of the general charge:

"BY MR. ORME: I except to that part of the oral charge of the Court which states: 'That we have in this case what is known as aiding and abetting,' and the Statute is read on *Aiding and Abetting*.

"I also except to that part of the oral charge which states: 'This brings into this case the question of conspiracy—', and the charge on *Conspiracy* is read.

"Both exceptions are on the grounds, that is a charge on evidence in this case."

The full instructions which occasioned this exception are:

"Now, Gentlemen of the Jury, we have in this case what is known as aiding and abetting, and I further charge you

that under our law, in Title 14, Section 14, (and the Court reads as follows:)

" 'The distinction between an accessory before the fact and a principal, between principals in the first and second degree, in cases of felony, is abolished; and all persons concerned in the commission of a felony, whether they directly commit the act constituting the offense or aid or abet in its commission, though not present, must hereafter be indicted, tried, and punished as principals, as in the case of misdemeanors.'

"Now, Gentlemen of the Jury, what that means is aiding and abetting. I charge you, gentlemen of the jury, where several persons participate in a crime of burglary, it is immaterial which one takes the property, since all persons participating in the crime are guilty as principals. And under this statute aiding and abetting comprehends all assistance rendered by acts, or words of encouragement, or support, or presence, actual or constructive to render assistance should it become necessary, and no particular acts are necessary.

"Now, the question of conspiracy is brought into this case, and I further charge you, gentlemen of the jury, 'Where by prearrangement or on the spur of the moment, two or more persons enter upon a common enterprise or adventure and a criminal offense is contemplated, then each is a conspirator, and if the purpose is carried out, each is guilty of the offense committed, whether he did any overt act or not, and such conspiracy need not be proved by any positive testimony and the jury is to determine whether or not it exists and the extent of it from conduct of the parties from all the testimony.'

"So, gentlemen of the jury, you are to look at all of the evidence in this case and see whether or not you are convinced beyond all reasonable doubt and to a moral certainty that there was a conspiracy here and whether or not this defendant was guilty of breaking and entering this school and whether or not, taking all of the evidence into consideration, if you are convinced beyond all reasonable doubt and to a moral certainty that this defendant participated, aided or abetted in the crime that he is here charged with, that is, burglary in the second degree."

Unlike many jurisdictions, Alabama tends to preserve a strict compartmentation between the functions of judge and jury. We have a Code provision, T. 7, § 270, which reads:

§ 270. "The court may state to the jury the law of the case, and may also state the evidence when the same is disputed, but shall not charge upon the effect of the testimony, unless required to do so by one of the parties."

Rowe v. State, 243 Ala. 618, 11 So.2d 749, cited by appellant, sets forth a number of cases illustrating the office of this statute. However, strictly the opinion is obiter dictum, since no exception was taken at Rowe's trial.

Although there was no evidence offered by the defense, we assume arguendo that the presumption of innocence, in effect, makes all of the State's evidence disputed for the purpose of the statute.

██ As we read the entire instruction as last set out, we are of the opinion the trial judge was expositing the law within the hypothesis of the State's theory. Certainly, T. 14, § 14, was apt. The judge left its application to the jury upon a consideration of all the evidence.

There was no error in this matter. Stevenson v. State, 18 Ala.App. 174, 90 So. 140.

We have reviewed the entire record agreeably with the statute and consider the judgment of the circuit court is due to be

Affirmed.