The appellant was charged in a five count indictment for violating Act No. 645, Acts of Alabama 1976, approved August 24, 1976 (now § 22-1-10, Code of Ala. 1975, 1978 Supp.). That Act provides in pertinent part that any person who, "with intent to defraud or deceive, makes or causes to be made any false statement or representation of a material fact in any claim or application for any payment, regardless of amount, from the Medical Services Administration, knowing the same to be false," shall be guilty of a felony carrying a penalty of a fine of not more than $1,000 or imprisonment for not less than one nor more than five years.
Count One of the indictment reads as follows:
 "Juanita Frye, whose identity to the Grand Jury is otherwise unknown, did after August 24, 1976, and before the finding of this indictment, with the intent to defraud or deceive, make or cause to be made in a claim or application for payment from Medical Services Administration of Alabama, to-wit: the 1977 Cost Report of the Carbon Hill Nursing Home for the fiscal year March 1, 1976, through February 28, 1977, knowing it to be false, a false statement or false representation of a material fact, to-wit: that the figure of, to-wit: $148,388.00 listed on Schedule D of the 1977 Cost Report represented salaries paid to the employees of the Carbon Hill Nursing Home for work actually performed, when in fact that figure of, to-wit: $148,388.00 contained the sum of, to-wit: $3,835.70 paid to Mrs. Vivian Keelon for work that she never substantially performed for the Carbon Hill Nursing Home."
Each of the four remaining counts of the indictment were the same except for listing different amounts paid to different persons for work they never substantially performed. Each of the persons set out in the indictment as receiving salaries for work not performed were shown by the evidence to be relatives of the owner of the nursing home, W.A. Keelon. *Page 895 
The jury found the appellant guilty and set a fine of $500 on each count. Since the sufficiency of the State's evidence was properly challenged in the trial court, it will be necessary to review that evidence.
Bob H. Nunelley was the first witness called for the State. He testified that he was an auditor with the Medical Services Administration (hereinafter MSA). He stated that MSA administers the Medicaid program in the state of Alabama. He explained how MSA computes its rate of payment to nursing homes for Medicaid patients:
 "The nursing homes furnish the Medical Services Administration a cost report which is the basis for setting a rate for the payment to the nursing home for Medicaid patients for the succeeding year. This cost report tells the Medical Services Administration how much it costs the nursing home to operate in various cost centers during a period of time. Those costs are divided by the patient days, the amount of time Medicaid patients have spent in the nursing home during a year in order to develop a per diem rate, a rate of pay to be paid to that nursing home for the next year."
Based upon the cost report of the Carbon Hill Nursing Home for the fiscal year March 1, 1976, through February 28, 1977, filed by the appellant with MSA in Montgomery, the per diem rate which MSA would pay the Carbon Hill Nursing Home was calculated to be $16.07. However, when the salaries paid to relatives of the owner of the nursing home were deducted, the rate MSA would pay the nursing home was $15.25 per patient per day.
The cost report for the Carbon Hill Nursing Home filed with MSA by the appellant lists Rhonda Keelon as a full-time employee and Vivian Keelon and Brenda Parker as part-time employees in nursing service. W.A. Keelon, Jr., is shown to be a part-time employee in housekeeping, and Jerry Keelon to be a part-time employee in maintenance.
The cost report covering the same period of time on the Winfield Nursing Home, likewise owned by W.A. Keelon, lists Brenda Parker, Vivian Keelon and Rhonda Keelon as full-time employees of that nursing home holding the positions of "Nursing Care (aide)." W.A. Keelon, Jr., is listed as a full-time employee in the housekeeping department, and Jerry Keelon is listed as a full-time employee in the maintenance department of the Winfield Nursing Home.
Mrs. Jimmie Little was employed at the Carbon Hill Nursing Home during a portion of the period covered in the cost report in question. She stated that she was a licensed practical nurse and was employed there as director of nurses. During the fiscal year March 1, 1976, the record indicates that she worked at the nursing home only during March and April and then again during July and August. During the time employed at the nursing home, Mrs. Little primarily worked from 6:30 a.m. until 3:00 p.m., five days a week. However, she often worked more than five days a week and more than eight hours a day and at times her working hours would be from 11:00 a.m. until 8:00 p.m.
Mrs. Little testified that she knew all the employees of the nursing home during the time she worked there, and did not know of any work done during that time by Brenda Parker, William A. Keelon, Jr., Jerry Keelon, Rhonda Keelon, or Vivian Keelon. She only saw Mrs. Vivian Keelon around the nursing home at Christmas parties. On cross-examination, when asked whether any of those persons did any work during the nine and one-half months when Mrs. Little was not employed, she stated that she did not know. Mrs. Little likewise testified that the records of the Carbon Hill Nursing Home were kept in Winfield and that she did not know if any of the family members had worked on those records at Winfield.
Jeannette Kelly testified that she worked as a nurse's aide at the Carbon Hill Nursing Home from March 1, 1976, through September 3, 1977, except for a six week period when she was sick. During that employment, she worked for a "long period of time" from 2:30 until 11:00 p.m., and for a "small amount of time" from 11:00 p.m. *Page 896 
until 7:00 a.m. Her working days varied and sometimes she worked on weekends and holidays. Mrs. Kelly stated that she knew all of the part-time and full-time employees who worked at the nursing home during the fiscal year in question. She said that neither Rhonda Keelon, Brenda Parker, nor Vivian Keelon ever worked there during the course of her employment. She had only see Vivian Keelon around the nursing home at Christmas parties. She did not know Jerry Keelon nor William A. Keelon, Jr., but stated that she had never seen either of them working there.
Maudie Hunt testified that she was employed at the Carbon Hill Nursing Home as a nurse's aide until September 1977. She worked in all areas of the nursing home, usually five days a week on the 3:00 until 11:00 p.m. shift. The days she worked would vary and would sometimes include holidays or weekends. She did not know Brenda Parker or Rhonda Keelon. She did know Vivian Keelon, but had never seen her working at the nursing home. However, she had seen her attending parties there. Mrs. Hunt had seen Mr. Keelon's sons working at the nursing home helping repair the furnace and helping strip wax from the floors; however, she did not see them working there regularly.
Lucy Dozier testified that she worked as a nurse's aide at the Carbon Hill Nursing Home from the end of 1969 until September 5, 1977. During the period covered by the cost report in question, she worked the evening shift, 3:00 until 11:00 p.m. She worked normally five days a week rotating weekends with other employees and occasionally would work another shift to fill in for an absent employee. The witness stated that she knew all of the employees on all the shifts at the nursing home. She did not know Brenda Parker or Rhonda Keelon, but had seen Vivian Keelon attending parties at the nursing home. She stated that she had seen the Keelon's sons working at the nursing home, but not on a full-time basis. She did not know how much time they worked, and she never saw the name of any of the members of the Keelon family listed on the work schedule that was posted at the hospital each week.
On cross-examination, Mrs. Dozier testified that the two Keelon sons had once been called to the nursing home when the furnace would not function, but they did not know how to fix it and another maintenance man had to be called in. She said the plumbing and furnace maintenance work was normally done by people other than the Keelon's sons. However, Mrs. Dozier had seen the sons working on the evening shift stripping wax from the floors. She said that job had to be started and completed on the evening shift while the patients were in bed. The floors were stripped on "something like" six month intervals. All of the employees at the nursing home maintained time cards; however, Mrs. Dozier never saw a time card there for any of the Keelons.
Donna Dodd worked at the Winfield Nursing Home from September 1974 until July 21, 1976. She was hired as a relief registered nurse for part-time work in the office. Later, additional duties were given to her as a relief nurse at the Carbon Hill Nursing Home two days a week and as a consultant nurse there four hours per week. One of Mrs. Dodd's duties was keeping the books and doing payrolls for both nursing homes. As the consultant registered nurse for the Carbon Hill Nursing Home, she reviewed the patients' charts, but had never seen a notation on any such charts made by Vivian Keelon, Rhonda Keelon or Brenda Parker. Likewise, in reviewing activity reports from that nursing home, she never saw a notation by any of the three and had never found any evidence of their having worked at that nursing home.
Mrs. Dodd testified that she had occasion to get in touch with Mrs. Vivian Keelon, who was usually reached at her home. She had never seen her in a nurse's uniform, and Mrs. Keelon did not have a time card. The witness stated that she did not pay Mrs. Keelon's salary based upon a time card, but paid her a monthly amount specified by the appellant.
Mrs. Dodd likewise testified that Brenda Parker was not an employee of the Carbon *Page 897 
Hill Nursing Home to her knowledge. She stated that Mrs. Parker was a housewife and worked part-time at Mr. Keelon's department store. Mrs. Dodd said that she paid Brenda Parker from the Carbon Hill Nursing Home account based upon the number of hours that she worked at the department store rather than work at the nursing home. In fact she had instructions to call Mrs. Parker each payroll period to determine how many hours she had worked during that month at the department store. The department store had no connection with the nursing home.
Mrs. Dodd testified that she knew Jerry Keelon, but did not know him to work at the Carbon Hill Nursing Home. She said he worked occasionally at the Winfield Nursing Home while he was going to Phil Campbell Junior College. She thought Jerry Keelon worked as a part of the construction crew at that time remodeling inside the nursing home. She said that she paid Jerry Keelon from the payroll account of both the Carbon Hill and Winfield Nursing Homes on order of Mrs. Frye, the appellant.
William Keelon, Jr., according to Mrs. Dodd, was around fourteen or fifteen years old and in either the ninth or tenth grade at Winfield High School where he attended on a regular basis. After school he usually came around to the Winfield Nursing Home. The witness never sent him to Carbon Hill, and he never kept a time card. "Junior" Keelon was paid monthly on order of the appellant. Likewise, Rhonda Keelon, around sixteen or seventeen years of age and a student at Winfield High School, was on the payroll of the Carbon Hill Nursing Home. Mrs. Dodd never saw her wearing a nurse's uniform and never knew her to work at the Carbon Hill facility.
Mrs. Dodd testified that she asked the appellant about the payments to members of the Keelon family. She said the appellant stated that Mr. Keelon, as owner of the nursing home, was allowed an administrative allowance that "was his to do with," and he had decided to divide it among his family.
Charles Wilbanks testified that he was employed by MSA in Montgomery as Assistant Director for Audits. His duties included auditing all providers for Medicaid except hospitals. He defined Medicaid as "a program for the indigent that the State matches money with the Federal government." He testified that MSA is an agency of the state which administers Medicaid. He said that the state appropriates money from the general fund and allocates it to MSA to be matched with three federal dollars to every one state dollar appropriated. Wilbanks explained the function of the cost report in substantially the same terms as earlier testified to by Bob Nunelley. He stated that once the per diem rate is figured based upon the allowable cost the previous year, the MSA fiscal department will prepare vouchers which go to the state comptroller who sends a check back to MSA to be forwarded to the nursing home in question.
Robert M. Black testified that he was principal of Winfield High School and that his records of attendance for the fiscal year in question indicated that William A. Keelon, Jr., had only eight absences from school that year. Likewise, his records indicated that Rhonda Keelon was a student at Winfield High School during that period.
Doris Evans testified that she was employed at Winfield High School during the period in question as a teacher and as coordinator for business and office education. She supervised Rhonda Keelon as a co-op student going to school a half-day and working a half-day. She testified that to her knowledge Rhonda Keelon worked at the Family Center, a store in Winfield owned by W.A. Keelon, Rhonda's father. She likewise knew William A. Keelon, Jr., as he had been in her accounting class at Winfield High School. She stated that as a tenth grader he was not eligible for the co-op program until the next year, and that all students are required to stay in school from 8:00 a.m. until 3:00 p.m. unless they are under the co-op program.
Mrs. Evans testified that an employer may pay a "student learner" only seventy-five *Page 898 
percent of the minimum wage; however, Rhonda Keelon did not want her to petition for the student wage because her father was going to pay the regular wage.
The State then called Howell B. Holland as its last witness. Mr. Holland stated that he was cashier at the Winfield State Bank, and he produced banking records of the Family Center which the State had subpoenaed. After searching the records for the fiscal year in question, he found no checks from the Family Center payable to Rhonda Keelon. At the end of his testimony, the defense moved to exclude the State's evidence for failure to prove a prima facie case. That motion was overruled by the trial judge. The defense presented several character witnesses and numerous other witnesses who had at various times and on various occasions seen some of the Keelon family members performing work at the Carbon Hill Nursing Home. Without setting out the details of such testimony, it is sufficient to note that each of the witnesses, including the Keelon family members themselves, presented evidence of only occasional duties performed by each during the period for which they were drawing monthly salaries.
 I
A motion to exclude evidence on the ground that it is insufficient is tested by the evidence at the time the motion is made. Tooson v. State, 56 Ala. App. 613, 324 So.2d 327, cert. denied, 295 Ala. 426, 324 So.2d 333 (1975). Assuming for the purpose of testing the sufficiency of the evidence that the indictments are valid and that Act No. 645, supra, is constitutional, we find that the State's evidence made out a prima facie case and the motion to exclude was properly overruled. In testing the sufficiency of the evidence on the basis of the appellant's motion for a new trial, we likewise find that there was evidence presented by the State as well as by the defense which if believed by the jury would support a verdict of guilt. After a careful review of the facts presented during the entire trial, we cannot say that the evidence was insufficient for a jury to find that Vivian Keelon, W.A. Keelon, Jr., Rhonda Keelon, Jerry Keelon and Brenda Parker were paid by the Carbon Hill Nursing Home for work which they never substantially performed. The evidence, and inferences drawn therefrom, would easily support a finding that the appellant included in the cost report filed with MSA a false statement or false representation of the material fact with the intent to deceive MSA into making higher payments to the nursing home than were legally due it.
This court has always adhered to the legal principle that a verdict will not be set aside on the ground of insufficiency of the evidence unless, after allowing all reasonable presumptions for its correctness, the preponderance of the evidence against the verdict is so decided as to clearly convince the court that it was wrong and unjust. Morton v. State, Ala.Cr.App.,338 So.2d 423, cert. denied, Ala., 338 So.2d 428 (1976). We conclude that the trial judge was not in error in overruling the appellant's motion for a new trial on the ground of insufficiency of the evidence.
 II
The appellant argues to this court that Act No. 645, supra, under which she was tried and convicted, is unconstitutional. Both briefs submitted by the appellant and appellee argue at length the constitutionality vel non of that Act; however, we are unable to find where that issue was raised in the trial court below.
The appellant filed a demurrer to the indictment and a motion to quash the indictment, both of which were overruled by the trial court. Neither the demurrer nor the motion to quash set out as a ground that the Act in question is unconstitutional. Neither does either pleading advance any of the arguments set out in the appellant's brief concerning the unconstitutionality of the Act. Neither was the now asserted unconstitutionality of the Act raised in the appellant's motion for a new trial. *Page 899 
Each of the grounds set out in those pleadings are general in nature. The record does not contain a transcript of any argument or testimony taken on those pleadings. For aught that appears in the record, the trial judge ruled on the demurrer and the motion to quash based solely on the grounds as set out therein. The proper way to reach defects in an indictment is by demurrer and not by a motion to quash. Jeter v. State, Ala.Cr.App., 339 So.2d 91 (1976), cert. denied, Ala.,339 So.2d 95. Therefore, we will only consider the trial court's ruling on the demurrer.
Grounds 1, 2 and 8 of the demurrer deal with venue. Grounds 3, 5 and 6 are general grounds alleging the indictment to be insufficient. Ground 4 challenges the indictment for failure to allege specific intent to defraud or deceive. Ground 7 attacks the indictment for failure to set out the law or code section under which the appellant is charged.
Each of the grounds set out in the demurrer challenge the indictment, not the constitutionality of the statute in question.
Even constitutional rights must be seasonably raised in the trial court in order to be considered on appeal. Harris v.State, Ala.Cr.App., 347 So.2d 1363 (1977), cert. denied, Ala.,347 So.2d 1368. To warrant a court to decree a statute void, the invalidity of that statute must be distinctly pointed out to that court, and where the alleged unconstitutionality of an act is not properly raised in the trial court below, the appellate courts are not at liberty to consider that issue on appeal. Hagendorfer v. State, Ala.Cr.App., 348 So.2d 1097
(1977), cert. denied, Ala., 348 So.2d 1101; Cooper v. State,55 Ala. App. 576, 317 So.2d 543 (1975); Lingle v. State,51 Ala. App. 210, 283 So.2d 660 (1973).
 III
Grounds 1, 2 and 8 of the appellant's demurrer to the indictment raise the issue of improper venue. Venue is not a question of criminal pleading, but rather of proof. Harris v.State, 44 Ala. App. 449, 212 So.2d 695, cert. denied, 282 Ala. 726, 212 So.2d 704 (1968); § 15-8-31, Code of Ala. 1975.
Ground 3 of the demurrer alleges that the facts set out in each count of the indictment do not constitute a crime. Ground 4 challenges the sufficiency of the indictment for failure to allege any specific intent by the appellant to defraud or deceive. Ground 6 contends that the allegations of the indictment are mere conclusions and not facts.
It has long been held in this jurisdiction that an indictment is sufficient which substantially follows the language of the statute, provided the statute prescribes with definiteness the constituents of the offense. Bowens v. State, 54 Ala. App. 491,309 So.2d 844, cert. denied, 293 Ala. 746, 309 So.2d 850
(1974).
For the indictment to be valid in the instant case, the State must have set out the following constituents: that the appellant (1) with the intent to defraud or deceive, (2) did make or cause to be made, (3) a false statement or representation of a material fact in a claim or application for payment, (4) from Medical Services Administration, (5) knowing such statement or representation to be false.
We have reviewed each of the five counts of the indictment in question and find that the State adequately sets out the constituents of the offense in substantially the same language as used in Act No. 645, supra. The indictment, therefore, adequately states an offense and is not demurrable under Ground 3 or 6 of the demurrer.
The trial court likewise did not err in overruling Ground 4 of the demurrer. Section 15-8-29, Code of Ala. 1975, states:
 "When an intent to injure or defraud is necessary to constitute an offense, it is sufficient to allege in an indictment an intent to injure or to defraud generally, without naming the particular person, corporation or government intended to be injured or defrauded."
Ground 7 of the demurrer likewise was properly overruled. It is unnecessary to set out in an indictment the code *Page 900 
section or statute under which a person is charged. Matters of which judicial notice is taken need not be stated in an indictment Section 15-8-32, Code of Ala. 1975. Courts take judicial notice of public statutes. White v. State, 42 Ala. App. 249, 160 So.2d 496 (1964).
 IV
The appellant contends that the indictment is void for failure to allege that the act was done "feloniously" or for failure to employ some adequate substitute for that word. The appellant cites as authority: Chappell v. State, 52 Ala. 359
(1875); Fendley v. State, 49 Ala. App. 393, 272 So.2d 600
(1973); Harmon v. State, 47 Ala. App. 1, 249 So.2d 369 (1970). In each of those cases, reversal was predicated upon the fact that the word "feloniously" or its equivalent was required in the code form indictments used.
In indictments for robbery and larceny, it is necessary to allege that the act was done feloniously or unlawfully for the purpose of showing intent. Without such an expression, "there is nothing in the indictment to show that the persons engaged in the affair were not merely indulging in mischievous sport, instead of being actuated animo furandi." Chappell, supra. It is clear that at least in robbery and larceny cases, not only does the word "feloniously" appear in the code form indictment, but it was necessary to make such an allegation of intent as a matter of common law. Absent the intent to steal, or animusfurandi, no crime would be described in an indictment for robbery or larceny. Harmon, supra. However, we are not dealing with a common law offense in the instant case. The conduct prohibited by Act No. 645, supra, only becomes illegal by virtue of that Act alone. The necessary criminal intent is set out in Act No. 645 as "intent to defraud or deceive." That criminal intent appears in each count of the instant indictment.
In cases involving felonies which were not common law offenses, we think the law is properly stated in Harris v.State, 248 Ala. 389, 27 So.2d 797 (1946). In that case, an indictment for illegal transportation of prohibited liquors followed the language of the statute with the exception that it did not allege that such transportation was "contrary to law." The Alabama Supreme Court found that a demurrer to the indictment did not specifically point out that defect and, therefore, held that the trial court was not in error for overruling the demurrer.
In the instant case, the indictment followed the language of the statute setting out each essential of the offense including the intent to defraud or deceive. We likewise note that most indictment forms appearing in the code, especially those pertaining to fraud, do not contain the word "feloniously" or equivalent verbiage. See: § 15-8-150, Code of Ala. 1975. The demurrer in the instant case lacked specificity to bring to the trial court's attention the argument now tendered by the appellant. The trial court therefore committed no error in overruling the demurrer. Harris, supra.
 V
The appellant contends that since there was only one cost report (claim for payment) made to MSA, then a single transaction may not be split into five separate counts in an indictment. This contention, as others previously noted, is made for the first time on appeal. The appellant's trial counsel filed both a demurrer and motion to quash the indictment; however, in none of the grounds is it contended that the five counts are an improper assertion of one criminal transaction. We note that the appellant is represented on appeal by different counsel than at trial.
Review on appeal is limited to a consideration of questions which were raised properly and timely in the trial court below.Harris, supra. In any event, Act No. 645, supra, relates to the making of "any false statement or representation of a material fact in any claim or application for any payment . . . from the Medical Services Administration." While the cost report in question reflects a total figure for salaries, still there is contained within the *Page 901 
cost report five separate and distinct statements or representations as to salaries paid to each of the Keelon family members in question. This amounts to five separate and distinct false statements or false representations of material facts submitted by the appellant to MSA in a claim for payment.
Where offenses are of the same general nature and belong to the same family of crimes, and where the mode of trial and nature of punishment are the same, they may be joined in the same indictment in different counts. Harger v. State,54 Ala. App. 242, 307 So.2d 51 (1974); Smelcher v. State,33 Ala. App. 326, 33 So.2d 380 (1947); Grayson v. State,28 Ala. App. 210, 182 So. 579 (1938).
AFFIRMED.
All the Judges concur.