Murder; sentence: life imprisonment.
Appellant was indicted under § 13A-5-31 (a)(7), Code of Alabama 1975, for the first degree murder of her husband, Jimmy Eugene Tucker, committed either for a pecuniary or other valuable consideration or for hire. The State's theory was not that the appellant had committed the actual murder, but that she had hired or caused a third party to kill her husband. After due deliberation, the jury returned a guilty verdict only as to the lesser included offense of murder.
Appellant's assertion that the evidence was insufficient to sustain her conviction necessitates that we detail the evidence *Page 543 
adduced at trial which sustained the State's case.
Gwin Jackson, dispatcher for the Kinston Police Department, testified that she received a telephone complaint from Kenny Davis at 10:38 p.m. on January 24, 1981, concerning a burning pickup truck. She dispatched the fire department and Police Chief Billy Flemming to the reported scene of the fire at 10:41 p.m.
Kinston Police Chief Billy Flemming testified he responded to a police dispatch concerning a burning truck on County Highway Six on January 24, 1981. He arrived first on the scene, followed immediately by the fire department. After the fire was extinguished, Chief Flemming began to transcribe the vehicle identification number from the truck door, at which time he observed in the vehicle a body which had been burned beyond recognition.
Chief Flemming testified a metal container was also found in the vehicle, located between the legs of the body. There was also a piece of garden hose approximately two feet in length found protruding from the truck's gasoline fill spout.
Brice Paul, Sheriff of Coffee County, testified he was called to the scene of a burning truck on County Road Six on January 24, 1981. He obtained the burned vehicle's tag number, called for a registration, and discovered the vehicle was registered to Jimmy E. Tucker. On the morning of January 25, 1981 Sheriff Paul went to Lyster Army Hospital at Fort Rucker, Alabama where he obtained the dental records of Jimmy Eugene Tucker.
Charles F. Brooks, a trace evidence analyst, testified his examination of the floorboard of the burned vehicle revealed the presence of a flammable liquid which was consistent with gasoline. In his opinion, an accelerant had been used in the interior of the truck. Mr. Brooks also compared the portion of garden hose which had been found in the fill spout of the burned vehicle with a portion of hose taken from the appellant's automobile and found that at one time the two pieces had been part of the same hose.
Dr. Richard Roper, a State forensic scientist, testified he compared the X-rays which he ordered on the body removed from the burned vehicle with the known X-rays of Jimmy Eugene Tucker and found they depicted the same person.
Dr. Thomas Gilchrist, a State forensic pathologist, also compared the X-rays taken by Dr. Roper with the known X-rays of Jimmy Eugene Tucker and found they depicted the same person. Further examination of the body by Dr. Gilchrist revealed the cause of death to have been internal hemorrhage from a gunshot wound to the chest which resulted in death prior to the fire's occurrence.
Testimony indicated the victim left work at Big-K in Enterprise, Alabama in his red Ford pickup at 9:20 p.m. on January 24, 1981. He followed a co-worker, Kenneth Beaty, to a nearby bank's night depository, and then preceded him as they traveled down Fort Rucker Boulevard. Beaty then turned off the boulevard as the victim continued on toward Fort Rucker. Mr. Beaty indicated he last saw the victim at approximately 9:35 p.m., immediately before turning off Fort Rucker Boulevard.
Ronnie Glover testified that he and a playmate discovered a white plastic bag protruding from the ground in Pinebrook Trailer Park on February 15, 1981. The bag contained a gun and holster, an army jacket, a pair of gloves, and a pouch containing bullets. He and his friend, Eddie, carried the bag to the trailer of Marie Breyer, with whom Eddie lived.
The gun which was found by the two boys was later examined by Lonnie Harden, a State firearms expert, in relation to the bullets removed from the victim's body. Mr. Harden determined that the bullets from the body were fired from the same gun found by the boys.
Bruce DeVane, Chief Investigator for the District Attorney of the Twelfth Judicial Circuit, testified he was called into the Tucker case by Sheriff Paul after midnight, in the early morning hours of January 25, 1982. After learning the vehicle's *Page 544 
registration, he proceeded to Fort Rucker, Alabama to the Post Trailer Park address indicated by the registration. Arriving at the trailer park address at 3:30 a.m., he found the victim's two daughters, Tracy and Terry, a friend of Terry's, and one Sandra Baxter at the victim's trailer. They reported that the victim was extremely overdue home from work. Investigator DeVane also learned that the victim's wife, the appellant, did not live at that address, but rather in Pinebrook Mobile Trailer Park in Enterprise.
Investigator DeVane proceeded directly to the appellant's trailer at Pinebrook, arriving there at approximately 4:00 a.m. on January 25, 1981. At the appellant's trailer, he encountered the appellant, LaDonna Tucker, and Douglas Ard. He inquired as to the whereabouts of the victim and the appellant stated she did not know where he was. She last saw him at 2:00 p.m. on January 24, 1981 at his trailer while visiting their two girls with her parents. She and the victim were separated and she was living at Pinebrook with Douglas Wayne Ard.
The record indicates that the appellant made the following statements to Investigator DeVane during his 4:00 a.m. visit to her trailer:
 "She stated that the past night, January 24th, 1981, Donald Ard, Douglas Ard's brother had borrowed her car and broke down in it on a road identified as the one with the barricade. She stated that Donald telephoned her residence advising of the breakdown around 8:30 p.m. January 24th, 1981. Subject stated that Douglas Ard telephoned Jimmy Tucker at the Big-K in Enterprise and asked him to come by and pick him up and go to the broke down car. Subject stated that she heard a horn blow outside of her residence at approximately 9:30 p.m. and assumed it to be Jimmy Tucker. She stated Douglas Ard went outside and returned approximately thirty to forty minutes later. I asked her at this time did she know the whereabouts of Donald Ard and she replied she did not know."
When Investigator DeVane returned and questioned appellant at 5:30 a.m., appellant added the following to her previous account:
 "Subject added the children lived with Jimmy through an agreement she and Jimmy had. Subject stated that she had two children. Subject stated that she and Doug Ard had been living together since November of 1980. Subject stated that she had met Doug at the Rainbow Vacuum Cleaner place in Enterprise through their employment with the company. Subject related that Donald Ard was Doug's older brother who was from Texas staying with them, but was unemployed. . . . Subject continued, stating that she and Jimmy Tucker had a good relationship with each other despite of their situation. Subject stated that it was not unusual for Donald Ard to borrow her car. When asked how long it was before Doug and Donald returned from the point Jimmy picked up Doug she replied thirty to forty minutes. Subject stated that when Doug and Donald returned they both walked into her residence together, but Donald left after staying just seconds. To where she did not know. Subject stated that she was alone in the trailer during the time Doug and Donald were gone. When questioned about the phone call Doug Ard got from Donald concerning Donald's break down she replied she did not pay any attention because the phone constantly rang all the time. Subject stated that Doug informed her of the break down and they both decided to call Jimmy."
In a third statement, made at 6:00 p.m. on January 25, 1981 appellant denied owning a gun, or ever having seen one in the possession of Donald (Donnie) or Douglas Ard. She also stated that a week before her husband's death she had talked over the telephone with him about "getting back together."
Gary Michael Snell, a former co-employee with appellant at Rainbow Vacuum Cleaner Service, testified that during a conversation he had with appellant at work in *Page 545 
September of 1980, appellant had asked him "to do away with" her husband so she could get her children back. He stated she asked him on three or four occasions to poison Mr. Tucker. Appellant offered him money to kill her husband. Snell finally told appellant that he had poisoned her husband's coffee at Big-K, but he stated he only told her that to placate her.
On another occasion, appellant and Doug Ard asked Snell if he knew someone who would help kill Tucker. Also, in October of 1980, Snell was present at appellant's trailer with appellant and Doug Ard when he heard appellant ask Doug if he knew someone who would kill Tucker. Doug replied that his brother Donnie would, and then Doug telephoned Donnie in Snell's presence and told him he had a job for him to do.
William Jenkins, another former employee of Rainbow, testified that he, appellant and Gary Snell were present at the appellant's trailer in November of 1980 when appellant asked him if he "could get rid of" her husband. When he replied that he could not, appellant indicated she would find someone else.
Art Bond, whose insurance agency represented Mutual of New York, testified that his agency processed an application for a policy insuring the life of Jimmy Tucker for the Military Benefit Association. The policy, underwritten by Mutual of New York, was in fact issued.
Christine Snell, death claims specialist with Mutual of New York, stated the above referenced policy was in full force and effect, with the appellant as beneficiary, on January 24, 1981. Her files also indicated that a claim signed by appellant was filed on that policy on April 1, 1981 pursuant to and at the instigation of a company investigation of Mr. Tucker's death.
Cynthia Ard, sister-in-law of Donnie Ard, stated she had a conversation with Donnie on December 17, 1980 concerning Jimmy Tucker. He told her he had a job to do that she did not want to know about. She asked if he was going to get rid of Jimmy Tucker, and he replied "maybe." He later told her that Doug Ard and appellant had asked him to do the job and he was to get ten percent of the insurance money.
During a conversation on December 18, 1980, Doug Ard, who was also Cynthia's brother-in-law, asked Cynthia if she wanted Donnie, with whom she was having an affair, to get rid of her own husband, Dave Ard. She told him he was crazy and he replied, "Well, that's what LaDonna and I are doing." Cynthia testified Doug specifically indicated that Donnie was "to get rid of" Jimmy Tucker.
On that same day, Cynthia had a conversation with appellant in which appellant told Cynthia she had attempted suicide because of Jimmy Tucker, but that pretty soon her problems would be over and she would not have to worry about it any more.
In December of 1980, Cynthia stated Donnie Ard told her he had previously blown up an automobile and killed a man, at the request of the man's wife, in exchange for insurance money.
Saundra Kay Henderson testified she was present in the mobile home of Cynthia and Dave Ard in December 1980 when she overheard Donnie Ard tell Cynthia "they" were going to kill Jimmy Tucker. On another occasion she also heard both Doug Ard and appellant separately tell Cynthia that they were going to get rid of Jimmy Tucker.
Jacqueline Ledbetter, a former schoolmate of appellant's, testified she had a conversation with appellant in which appellant stated she was studying a drug to give her husband which would kill him without leaving any aftereffects. Appellant further stated that if she could not live with him and have him, she did not want anybody to do so.
Bruce DeVane, recalled by the prosecution, testified he had a conversation with Donnie Ard on February 17, 1981 in which Ard stated he had obtained a .357 Armenus Magnum revolver from Ted Bradshaw. Ard stated he put the weapon, which was the same type weapon as the pistol used to kill Jimmy Tucker, in a bedroom closet at appellant's trailer. The last time Ard saw *Page 546 
the weapon was on the afternoon of January 24, 1981.
 I
Appellant initially contends that she was convicted of second degree murder under Title 14, Section 314, Code of Alabama 1940. Referring the court to § 13A-5-57, Code of Alabama 1975, appellant argues the State was relegated to the imposition of the Title 14 offense by the holding in Beck v. Alabama,447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980). She contendsBeck declared that § 13A-5-31, Code of Alabama 1975, was unconstitutional and that the repealer clause found in §13A-5-57 must be referred to preexisting "constitutionally sound law," i.e., Title 14, Section 314, Code of Alabama 1940.
Appellant's specious argument overlooks the Alabama Supreme Court's ruling in Beck v. State, 396 So.2d 645 (Ala. 1980), which corrected those portions of the Alabama Death Penalty Act found to be constitutionally infirm under Beck v. Alabama, supra. As Beck v. State, supra, plainly states, "the Alabama rule concerning lesser included offenses will apply so that juries in capital cases will be instructed on each lesser included offense which has any basis in the evidence. . . ."Beck v. State, at 658. Where an appellant is found guilty of a lesser included offense, the sentencing procedures for non-capital cases which are applicable at the time the offense was committed shall be applied. Beck v. State, supra.
Appellant was properly convicted of the lesser included offense of murder, per the mandates of Beck v. Alabama and Beckv. State regarding lesser included offenses. See, Busby v.State, 412 So.2d 837 (Ala.Cr.App. 1982).
 II
Appellant argues the State's evidence was insufficient to prove that she and Douglas Ard "caused" Donnie Ard to kill Jimmy Tucker. Appellant asserts, as did the appellant in Busby, supra, that the jury's conviction of appellant upon a lesser offense negates the assertion that appellant hired Donnie Ard to kill her husband for a monetary consideration. Appellant contends, just as this court pointed out in Busby, that the State's evidence therefore must have proven that appellant and Douglas Ard caused, induced or procurred, by suggestion or other non-pecuniary measure, Donald Ard to kill Jimmy Tucker, in order to sustain appellant's murder conviction. Busby, supra; Alabama Code § 13A-2-23 (1975) and Alabama Code §13A-6-2 (a)(1) (1975).
Appellant further grounds her argument upon the proposition that the evidence the State adduced at trial which tended to prove her guilt was inadmissible because it was introduced in the form of hearsay statements. She divides these alleged hearsay statements into two categories as follows: (1) witnesses who related statements made to them by appellant in which she elicited their help in killing her husband; and (2) witnesses who related statements made to them by appellant's cohorts, Doug and Donnie Ard, indicating their intent to kill Jimmy Tucker.
As to the first category of statements, it is clear that statements by an accused preceding the criminal act, which assert a design or emotion indicative of guilt, are admissible against her as an admission. C. Gamble, McElroy's AlabamaEvidence § 264.01 (1) (3d ed. 1977), Smoot v. State,381 So.2d 668 (Ala.Cr.App. 1980).
Appellant contends the second category of statements were inadmissible because, prior to their admission, the State failed to adequately prove that a conspiracy to kill Jimmy Tucker existed. As well, appellant contends that the State at no point in the trial independently proved that such a conspiracy existed.
Where proof of a conspiracy is shown, statements by the accused's confederates made before, during, and in furtherence of the crime's perpetration are admissible against the accused. Even if testimony relating statements made by confederates *Page 547 
is objectionable as premature, in that independent proof of a conspiracy has not been established before its admittance, subsequent proof of the conspiracy cures any error in the premature admission. Conley v. State, 354 So.2d 1172
(Ala.Cr.App. 1977).
We now review the State's evidence to determine its sufficiency to sustain the jury's verdict, as well as to prove, independently of the confederates' statements, that a conspiracy to kill Jimmy Tucker existed.
The State's evidence presented prior to the confederates' statements revealed appellant's husband was shot to death and that his body was then burned in his pickup truck. A piece of garden hose found in appellant's automobile after the fire was examined and found to have been a part of the same garden hose found in the fill tank of the burned vehicle. A pistol and other items contained in a plastic bag were found buried in the trailer park where appellant lived. Subsequent examinations of the gun proved it to be the murder weapon.
Statements made to police by appellant shortly after her husband's death indicated he had picked up Doug Ard at her trailer immediately before his death, after having arrived there in response to a call from Doug Ard indicating Donnie Ard had broken down with car trouble in appellant's automobile.
Gary Snell testified that appellant had repeatedly requested in September, 1980, that he kill her husband. At this point in the trial, the State introduced Snell's testimony that he, appellant, and Doug Ard were present during a conversation in October 1981 where appellant and/or "they" asked him about contacting another person to help kill Mr. Tucker. Also in October 1981 Snell heard appellant ask Doug Ard if he knew someone who would kill Tucker. Ard replied yes and then called his brother Donnie and told him he had a job for him.
Other testimony of statements made by appellant, Doug Ard, and Donnie Ard is set forth supra, which indicates appellant's desire to find someone to kill Mr. Tucker, the fact that appellant and Doug asked Donnie to do the job for ten percent of the insurance money, and that Donnie agreed to do the job. Saundra Kay Henderson specifically testified that she heardappellant and Doug Ard state "they" were going to get rid of Mr. Tucker.
Other testimony indicated that Donnie Ard did in fact own a pistol which was the same type as the one with which Tucker was killed.
Keeping in mind that subsequent proof of a conspiracy cures any error in premature admission of a confederate's statements, we find that the evidence adduced at trial of the gun, the hose, and appellant's statements to both the police and third parties, independent of her confederates' statements, was sufficient to prove the existence of a conspiracy. Considering additionally the testimony pertaining to statements made by appellant's confederates, clearly the State established a prima facie case sufficient to sustain a jury's finding that appellant caused, induced, or procured either Donnie or Doug Ard, or both, to kill her husband, and that she aided or abetted them in the murder. Conley, supra, Busby, supra.
 III
Appellant contends that newly discovered evidence entitled her to a new trial. The newly discovered evidence consists solely of the testimony of Douglas Ard, given by him during appellant's sentencing hearing on March 5, 1982.
Appellant's written motion for new trial was filed on March 29, 1982. While it referred to newly discovered evidence generally, no specific evidence was mentioned. By letter dated April 15, 1982, appellant affirmatively waived a hearing on her motion and submitted the motion for a ruling without presenting any evidence. The trial court denied appellant's motion for new trial by order dated April 20, 1982.
Error may not be predicated upon the overruling of a motion for new trial where there was no evidence offered in *Page 548 
support of the motion. McKinnis v. State, 392 So.2d 1266
(Ala.Cr.App. 1980), cert. denied, 392 So.2d 1270 (Ala. 1981). However, even assuming that the introduction of further evidence was unnecessary because the trial judge had prior knowledge of the evidence referred to in appellant's March 29, 1982 motion, having presided at appellant's sentencing hearing on March 5, 1982, we find no error. McKinnis, supra.
Douglas Ard testified at appellant's sentencing hearing that he was responsible for Jimmy Tucker's death. He indicated he killed Tucker without the knowledge, inducement, or participation of appellant. He stated the killing was motivated by a conversation he had heard between appellant and Tucker in which they discussed getting back together. Ard denied that there was ever any understanding or agreement among himself, appellant, and Donnie Ard to kill Jimmy Tucker. The testimony indicated that his brother's involvement in decoying Tucker to the murder scene was innocent in nature, apparently having been done at his unexplained request. Donnie participated in disposing of the body because he felt "compelled" to help his brother.
Ard stated he first admitted killing Tucker to his attorney on February 8, 1982. On March 4, 1982 Ard told private investigator Gary Brown he murdered Tucker and requested him to inform appellant's counsel that he desired to testify at appellant's sentencing hearing. He did not come forward with his admission earlier because he thought appellant would be acquitted. Appellant also indicated he pleaded guilty to a charge of murder for Tucker's death on February 9, 1982, after appellant was tried. He stated he never actually told appellant that he killed Tucker prior to his testimony at the sentencing hearing.
Even though a new trial may be granted upon newly discovered evidence which indicates that another person has committed the crime for which the accused was convicted, the decision to award the new trial is vested in the sound discretion of the trial judge. Whether the new trial is to be granted depends largely on the credibility of the new evidence. Robinson v.State, 389 So.2d 144 (Ala.Cr.App.), cert. denied, 389 So.2d 151
(Ala. 1980).
Motions for new trial based upon newly discovered evidence are viewed with disfavor by appellate courts, and only in cases where the trial judge has clearly abused his discretion will his decision be disturbed. Prince v. State, 356 So.2d 750
(Ala.Cr.App. 1978).
Appellant's testimony indicated in part what the State had already proved — that he and his brother participated in the death and burning of Jimmy Tucker. His admission of individual guilt came after he had already pleaded guilty to that crime and thus he did not risk conviction of the deed for admitting the crime. Also, he admitted that the murder, apparently as well as his present admission, was motivated by his love for appellant. Certainly the inference could be drawn that because he was already convicted, and that because of his relationship with appellant, he had reason to give false testimony.
Based on these observations, we do not find that the trial court abused its discretion in denying appellant's motion. The credibility of the evidence was therefore for the trial judge to determine, and not for this court to decide. Robinson, supra.
 IV
Appellant contends the trial court erred in refusing to grant a mistrial because of a comment made by the prosecutor which appellant alleges impermissibly referred to appellant's failure to testify.
The comment referred to occurred during the presentation of the State's case and appears in the record as follows:
"Q Did you then telephone LaDonna?
 "A I telephoned her, but it took me I don't know how long to find out that —
 "MR. STEPHENS: We object, may it please the Court, what he found out in a telephone conversation.
"Q What did she state to you? *Page 549 
 "MR. STEPHENS: We object to what she stated to him. She's here, may it please the Court. She can tell what she told him.
 "MR. CULPEPPER: Judge, we object to that. Object to the remark just made by Mr. Stephens.
"MR. SMITH: That is a highly improper statement.
"THE COURT: Sustain objection.
"MR. SMITH: And we ask the Court to reprimand —
 "THE COURT: I just sustained the objection and charge the gentlemen to disregard the statement of counsel."
We find the following language in Gamble v. State,44 Ala. App. 1, 200 So.2d 500, cert. denied, 281 Ala. 720,200 So.2d 504 (1967):
 "The comments by the solicitor were, in our opinion, not prejudicial to appellant. The statements were not a comment upon appellant's failure to testify, for at this point in the trial the solicitor could not have known whether appellant was to testify or not. It is evident from the context of the argument at that time that the solicitor was arguing the admissibility of evidence which he thought was hearsay. The objection which he raised was on the basis that the witness could not say what he heard from appellant, and that only the one who spoke could actually say what transpired.
. . . .
 ". . . This statement by the solicitor was only a comment by him upon the evidence during the trial, and not an unfavorable allusion to appellant's testimony or silence."
Here, as in Gamble, the prosecutor's comment was only a comment upon the evidence during trial, and not an attempt to allude to the appellant's testimony or silence.
In Cook v. State, 52 Ala. App. 159, 290 So.2d 228 (1974), the court found no error under circumstances similar to those in the instant case. There the court held that the prosecutor's comment was merely an incident of trial which was not intended, and could not have been construed by the jury, as a comment on the appellant's failure to testify. Rather, it was intended as argument on the admissibility of other evidence. The court noted additionally that, just as in the instant case, the appellant had not failed to testify at the time the comment was made, and that the appellant did in fact subsequently testify.
In Collins v. State, 385 So.2d 993 (Ala.Cr.App. 1979), reversed on other grounds, 385 So.2d 1005 (Ala. 1980), this court stated that impermissible comments by the prosecutor need not be made only during closing argument to create reversible error. "An accused's right to remain silent is inviolable at every stage in the proceedings and must be afforded due protection." Collins, at 1001. Collins condemns the prosecutorial "tactic," not here presented, of focusing the jury's attention on what the accused will or will not testify to at trial.
Further, we have reviewed the remark and do not find it to have been so grossly improper and highly prejudicial as to have been ineradicable. Collins, supra. The trial judge sustained the appellant's objection and immediately instructed the jury to disregard the remarks. The following then transpired:
 "MR. SMITH: Judge, he has made a direct comment on the evidence that the defendant —
"THE COURT: I know what he said.
 "Now, let me ask the State. Everybody is talking about eradicating. That requires comments by me to the jury that a defendant on trial has the right to remain silent, that the right to remain silent and not take the witness stand is exercised there can be no comment upon her election to remain silent or any inference or presumption taken against her, that statement by the State was statement saying she could take the witness stand, which might under some circumstances be inferred as a comment on her privelege against self incrimination or right to remain silent. The Court sustained objection and now tells the gentlemen *Page 550 
of the jury to forget the comment and not create any presumptions against the defendant for her right to remain silent if she so elects or anything else. Assuming that she doesn't take the witness stand what position am I going to be putting this case in by those statements at this time? Can it be properly eradicated.
 "MR. CULPEPPER: We don't think that the Court could help the situation by making those statements at this time. If the Court is going to deny the motion for mistrial then we ask that the decision about what instructions to be given along those lines be deferred until —
 "THE COURT: Let me find out from all concerned, is this the time for me to start talking about presumptions, the silence and the rights of the defendant to either elect or not to elect. I can't eradicate it any other way without going to them right now.
 "MR. CULPEPPER: But, we are put in a worse position by your making that statement here in a point in the trial when it is not even known by the jury whether she will or she won't testify.
 "THE COURT: So the defense does not wish for me to make any comment at this time other than to rule on the motion for mistrial?
"MR. SMITH: At this time, Judge."
The court's failure to go further in attempting to eradicate any potential negative effect of the statement was at the appellant's insistence. The appellant having affirmatively requested that the trial court refrain from further instructing the jury, she waived her original objection and may not now seek reversal against her own invited error. Collins, supra.
Considering that the remark was made by the prosecutor before the appellant subsequently testified, due to an incident of trial which was not intended or to be understood as a comment on appellant's failure to testify, and that any potential error was waived by appellant's request that the court omit further curative instructions, we find no error.
 V
Appellant's final contention is that the court erred in failing to excuse for cause a jury venireman who was the brother of one of the State's witnesses. Appellant's challenge appears in the record as follows:
 "MR. CULPEPPER: We want to challenge Jerry Bradshaw for cause. He is the brother of perhaps the most material witness in the entire case.
"MR. STEPHENS: That don't make any difference.
"THE COURT: Challenge denied.
"MR. CULPEPPER: We respectfully except.
 "MR. SMITH: We represent to the Court that he was identified and stated to the Court during the qualifying questions that he is a brother to Ted Bradshaw. We represent to the Court that Ted Bradshaw is a material witness; very, very material witness for the State who will testify in this proceeding. We think that should disqualify him.
"THE COURT: I disagree."
On appeal appellant now argues that because the defendant viewed the evidence presented at trial as indicating that Ted Bradshaw may have been implicated in the crime, Bradshaw's brother, Jerry, would have had an impermissible interest, under § 12-16-150 (6), Code of Alabama 1975, in convicting appellant in order to "draw further suspicion away from Ted." The appellant does not contend, and the record does not reveal, that the trial court was ever apprised of appellant's theory during the jury selection process or at any time prior to or during trial.
We note also that the venireman in question did not serve on appellant's jury, having been peremptorily struck by appellant.
Alabama cases, both criminal and civil, as well as general statements of the law in this area, state that the relationship of a prospective juror to a witness does not as a general rule disquality him as a juror. Rakestraw v. State, 22 Ala. App. 487,116 So. 414 (1928); Nix v. City of Andalusia, *Page 551 21 Ala. App. 439, 109 So. 182 (1926); Tidmore v. Mills,33 Ala. App. 243, 32 So.2d 769, cert. denied, 249 Ala. 648,32 So.2d 782 (1947); 47 Am.Jur.2d Jury § 315 (1969); see alsoJones v. State, 230 Ark. 18, 320 S.W.2d 645 (Ark. 1959).
It has been held that the mere fact, standing alone, that a juror is related to a witness does not ipso facto disqualify him from service. State v. Jones, 345 So.2d 1157 (La. 1977). The Louisiana court has also held that the relationship between a prosecuting witness and a juror who were step-brothers was not in itself a ground for disqualification. State v. Oliver,193 La. 1084, 192 So. 725 (La. 1939).
Our review of the law indicates there is no general per se rule of the common law which disqualifies a juror because of his relation to a witness. See, State v. Hilton, 87 S.C. 434,69 S.E. 1077 (S.C. 1911). Our statute contains no such disqualification in its enumerated causes for challenge. Watsonv. State, 398 So.2d 320 (Ala.Cr.App. 1980), cert. denied,398 So.2d 332 (Ala. 1981), cert. denied, 452 U.S. 941,101 S.Ct. 3085, 69 L.Ed.2d 955 (1981); Ala. Code § 12-16-150 (1975).
We turn to the question of the merits of appellant's argument that the juror had an "impermissible interest" under §12-16-150 (6), Code of Alabama 1975.
Appellant did not request at trial that either she or the court inquire further of the juror to ascertain the existence of any possible prejudicial interest. While the trial court is under a duty to preserve the rights of an appellant to question a witness to determine interest or bias, no request by appellant was made here, and the grounds for challenge stated by appellant would not have put the trial court on notice to itself inquire further. Smithson v. State, 50 Ala. App. 318,278 So.2d 766 (1973). No testimony was presented to the trial court, prior to trial, or on motion for new trial, to demonstrate the cause for bias asserted by appellant on appeal.
Smiley v. State, 371 So.2d 469, 470 (Ala.Cr.App. 1979) applies the following standard:
 "The rule to govern us is succintly stated in Williams v. State, Ala., 342 So.2d 1328, 1329, as follows:
 "`We state the rule thusly: A motion challenging the composition of a grand jury, a petit jury, or qualifications of individual jurors, filed after the commencement of trial, must allege, and proof must show, that grounds for the motion were not known to the defendant before he went to trial, or that he could not have known them by exercising due diligence.'" (emphasis supplied).
The trial transcript reveals that appellant was aware of the alleged bias made the grounds for challenge on appeal prior to the commencement of trial. In fact, it appears she attempted to base her defense, in part, upon the alleged implication of Ted Bradshaw. Her failure to bring this known issue to the court's attention prior to trial, and her failure to allege and prove upon her motion for new trial that the grounds were unknown to her prior to trial precludes any finding of error by this court. Smiley, supra.
Additionally, in our view, the evidence presented at trial worked as much to exonerate Ted Bradshaw as to implicate him. While Bradshaw may have at one time possessed the murder weapon, Officer DeVane testified that Donnie Ard stated he obtained ownership of the pistol from Bradshaw for $165 prior to the victim's murder. Other proof pointed to by appellant in arguing her contention on appeal is vague, equivocal, and inconclusive.
Finally, we note that the entire jury venire, including the veniremen in question, was asked the following:
 "MR. STEPHENS: Ladies and Gentlemen, my name is Lewey Stephens. Several of you raised your hand and said that you had read or heard something about the case, this case and/or the case of Donnie Ard and/or the case of Doug Ard. I ask you if anything you have heard or read would affect your taking the evidence in this case as it is given to *Page 552 
you from the stand and the law as the judge outlines to you and base any verdict that you might reach in this case strictly on the evidence in this case and the law as the Judge explains it to you? Any of you have any problem with that.
 "(No juror responded in the fact they would have a problem. Mr. Stephens asked this question in a similar fashion to all the other groups and no juror responded positive that they would have a problem.)"
To be disqualified as a juror, a venireman must have more than a bias as to the guilt of the accused. The opinion must be so fixed that it would bias the verdict the juror would be required to render. Tidmore v. City of Birmingham,356 So.2d 231 (Ala.Cr.App. 1977), cert. denied, 356 So.2d 234 (Ala. 1978), cert. denied, 439 U.S. 836, 99 S.Ct. 120, 58 L.Ed.2d 132
(1978). No such disqualifying bias, under any rationale, is demonstrated on appeal.
For the reasons stated above, the judgment of conviction by the Coffee Circuit Court is hereby affirmed.
AFFIRMED.
TYSON, HARRIS and BOWEN, JJ., concur.