Appellant was charged with capital murder pursuant to a contract for hire under § 13-11-2 (7), Code of Alabama 1975. The indictment alleged that she had agreed to pay one Terry Lewis and one Dennis Cross approximately $10,000 to shoot her husband, Houston Busby.
After a trial during which the court instructed the jury on the lesser included offenses of murder and manslaughter as mandated by Beck v. Alabama, 447 U.S. 625, 100 S.Ct. 2382,65 L.Ed.2d 392 (1980), after remand, Beck v. State, 396 So.2d 645
(1980), appellant was found not guilty of the capital offense but guilty of the offense of murder. The trial judge sentenced appellant to life imprisonment.
The evidence for the State established that the body of Houston Busby was found in a pickup truck off Hamilton Boulevard in *Page 839 
Mobile, Alabama, on March 14, 1980, and that Busby died as the result of a gunshot wound to the head. Mobile Sheriff Detective Willie Edward Estes went to the Busby Sand Company on the morning of March 14 to inform the appellant (deceased's wife), who worked as secretary-receptionist for the company, that her husband was dead. Appellant replied that her husband had left home the night before and had not returned.
Detective Estes also testified that he asked appellant whether he could search her residence and she signed a consent to search form and followed him to her home. Upon arriving at the Busby house, Estes saw Terry Lewis and Dennis Cross and he questioned both. Estes then entered the residence and observed what appeared to be blood stains and tissue fragments on the walls and curtains of the master bedroom. Next he advised appellant of her Miranda rights and conducted a thorough search of the house.
Detective Ron Diegan of the Mobile County Sheriff's Department testified that after appellant was placed under arrest, he observed her go into the bathroom and push an object under some towels in a linen closet. At that point Diegan entered the room and retrieved a black pouch containing $14,000 from beneath the towels. Following a conversation with Dennis Cross, Detective Diegan took underwater divers to an area near Brown's Bridge in Mississippi and recovered a Marlin 30-30 lever action rifle.
Kenneth Ladner, appellant's son and the deceased's stepson, testified that on several occasions prior to Houston Busby's death, he had heard his mother discuss paying to have Busby killed. Ladner said that the discussions took place in the presence of Terry Lewis and Dennis Cross and occurred after his mother had been beaten by his stepfather. Ladner stated that on May 13, 1980, Terry Lewis borrowed his rifle. He identified the rifle recovered by Detective Diegan as his gun. Ladner testified that when he loaned the gun to Terry Lewis he had an idea that Lewis was going to kill Houston Busby.
When Ladner returned home after midnight on March 14, 1980, he did not see Houston Busby, but he found his mother, Tonya Busby, Terry Lewis and Dennis Cross cleaning up bloody bedding in the master bedroom. Appellant told Ladner to watch from the window to see if anyone was coming. According to Ladner, the appellant instructed the others to put bricks into garbage bags with the blood-stained bedding. Ladner said that he, Cross and Lewis then drove to a bridge near the Mississippi State line and threw the garbage bags and rifle into the water.
On cross-examination, Ladner said that he did not take his mother seriously when she mentioned having her husband killed and he did not think Lewis or Cross believed she was serious either. He admitted that he hated and feared his stepfather, whom he described as six feet, three or four inches tall and weighing 230 pounds, because Busby had beaten him before. Ladner said that his mother had always carried large sums of money and it was not unusual for her to have $14,000 in the black pouch.
Lynn Busby, appellant's former daughter-in-law, testified that about six weeks prior to Houston Busby's death appellant told her that she had talked with a man about having her husband "taken care of." Later, on the night before the murder, appellant told Ms. Busby that if Houston "laid a hand on her" it would be "the last chance he would have." According to the witness, appellant stated that there was a price for having her husband killed and she would be willing to pay it. On cross-examination, Ms. Busby acknowledged that she had seen appellant bruised and swollen on several occasions. She also stated that appellant and Houston Busby were in the habit of carrying large sums of cash and she had previously seen appellant with a black pouch of money.
Over appellant's objection, the State then called Dennis Cross, who refused to answer, based on the Fifth Amendment, any questions other than his name and age. The State rested its case and the defendant's motion to exclude was denied. *Page 840 
The defense called Donna Busby, appellant's thirteen-year-old daughter. Miss Busby stated that at the time of her father's death she was dating Dennis Cross. On the afternoon of his death Houston Busby and his stepdaughter Tonya had a disagreement during which Houston called Tonya a "whore." The deceased also cursed his wife, the appellant. Donna testified that during the afternoon and evening both Tonya Busby and Terry Lewis were angry at the deceased. After dinner Donna Busby had a conversation with Dennis Cross during which she learned of a plan to kill Houston Busby. Donna Busby then went to bed and did not awake until 6:15 the next morning. She learned from Dennis Cross at that time that Houston Busby had been killed. She said that she hated her father and was glad he was dead because he had abused her mother, brother and sister for so long. She stated that her parents had kept large amounts of cash in a black money pouch for as long as she could remember.
Tonya Busby, the deceased's fourteen-year-old stepdaughter, testified that she was engaged to Terry Lewis. On the day of Houston Busby's murder she and her stepfather had an altercation and he called her a "whore" within the hearing of Terry Lewis. Lewis then had a conversation with Dennis Cross after which he told Tonya, "It is going to happen tonight." Tonya stated that Lewis had threatened to kill Houston Busby on prior occasions when he learned that Busby had abused her, and she did not believe he was going to kill her stepfather that night. Miss Busby stated that Houston had beaten her and tried to rape her and she was glad he was dead.
On the night of the murder Tonya went to bed at 10:00 P.M., but woke up around midnight when she heard what sounded like a truck outside the house. She walked out of her bedroom and saw the appellant, her mother, and a bloody mess in the master bedroom. She did not see her stepfather. Her mother told her to start cleaning up and she complied. Tonya testified that Ladner, Cross and Lewis left the house and she and her mother then went back to bed.
The defense called two character witnesses who testified to the appellant's good reputation for truthfulness and peacefulness. One recalled that he had seen the appellant come to work with bruises and black eyes on prior occasions and he stated that it was not unusual to see her with large sums of money in a black bag.
Jerry Merit testified that he lived with the Busby's for five years. During that time he saw the deceased abuse the appellant and her children and he himself had also been beaten by the deceased.
Marie Busby testified in her own behalf that she had lived with Houston Busby for fourteen years and they had one child, Donna. Her husband physically abused her at least three times a week and threatened to kill her if she ever left him. She stated that she had never made an offer of money to anyone to have her husband killed. She admitted that, after a beating, she may have said she wished he were dead, or she would give $10,000 to have him killed, but she did not intend for anyone to take her seriously.
The appellant testified that on the night of her husband's death she cleaned up in the kitchen and her husband retired for the evening. Then she went to take a shower and while she was in the bathroom she heard what sounded like a gunshot. She put on her robe and started out of the bathroom when Terry Lewis appeared at the door with a gun in his hand and said "You don't want to come out now." She was scared and she stayed in the bathroom crying until Lewis returned and told her to come out. Lewis then informed her that Busby was dead.
Appellant stated that she was afraid her daughter Tonya had helped Lewis kill Busby and all of her (appellant's) further actions that night and the following day were done in an effort to protect her daughter. Appellant admitted cleaning up the bedroom but denied planning to have her husband killed. She denied telling Lynn Busby about a plan to pay for her husband's murder. She stated that she tried to hide the *Page 841 
black money pouch before being taken to headquarters with the officers because she did not want to take that much money to the jail with her. At the conclusion of appellant's testimony, the defense rested.
 I
Appellant contends that the State's evidence proved, if anything, only the capital offense of murder for hire, and that the jury's failure to convict her on that charge should have resulted in an acquittal. She claims that there was no evidence of non-capital murder.
In our judgment, the evidence, though conflicting and circumstantial, was sufficient to support appellant's conviction for the lesser offense of murder on the theory of procuring or aiding and abetting as outlined in § 13A-2-23, Code of Alabama 1975. That section provides, in pertinent part, the following:
 "A person is legally accountable for the behavior of another constituting a criminal offense if, with the intent to promote or assist the commission of the offense:
 "(1) He procures, induces or causes such other person to commit the offense; or
 "(2) He aids or abets such other person in committing the offense. . . ."
The jury may have chosen to disbelieve the evidence that appellant actually offered money to Lewis and Cross for the murder of her husband, but concluded instead that she "procure[d], induce[d] or cause[d]," by suggestion or other non-pecuniary means, the two boys to commit the crime. SeeMcMahan v. State, 168 Ala. 70, 53 So. 89 (1910).
Appellant admitted that she hated her husband and wished him dead. She was present in the house when he was shot and she helped conceal the evidence of his murder. From these facts, the jury could reasonably have inferred that she participated in planning the crime and was ready to render aid should it become necessary. Appellant would thus be guilty of murder on the theory of aiding or abetting. See Fuller v. State,43 Ala. App. 632, 198 So.2d 625 (1966); White v. State, 42 Ala. App. 249, 160 So.2d 496 (1964). See also Walls v. State, Ala.Cr.App., 378 So.2d 1193 (1979). We therefore find that the evidence fully warranted the verdict of the jury.
 II
Appellant points out that the trial court explained complicity liability three times during its oral charge; she claims that the charge "unduly emphasized the complicity aspect of the State's case."
The statute under which appellant was indicted provided that the death penalty be imposed for the following:
"Murder in the first degree when the killing was done for a pecuniary or other valuable consideration or pursuant to a contract for hire."
Ala. Code § 13A-5-31 (a)(7) (1975) (repealed by Ala. Act No. 81-178, § 20 (July 1, 1981)).
The record reflects that the trial judge explained all the elements (including complicity) of murder in the first degree as it related to the capital offense contained in § 13A-5-31 (a)(7), supra. The court also explained all the elements (including complicity) of the lesser offenses of murder and manslaughter.
In our judgment, the court's charge did not unduly focus on complicity. The charge, defining three separate offenses with sometimes overlapping elements, was necessarily repetitive. However, the repetition extended to all elements and did not unduly emphasize any particular aspect. We find no error in this regard.
 III
Appellant insists that the trial court erred by denying her motion for a continuance.
Appellant's trial was originally set for January 5, 1981. On October 29, 1980, she filed a motion to produce; a hearing on the motion was set for December 10, 1980. The hearing was continued; the record does not reveal the reason for the continuance but there is some indication that none of the *Page 842 
parties objected to postponing the matter. The motion to produce was heard and granted in part on January 5, 1981. Appellant was tried the following day, January 6.
Appellant claims that since the prosecution did not fully comply with the order to produce until 5:00 P.M., on the day before trial, and some of the material disclosed by the State was of a surprising nature, she did not have enough time to prepare her defense. She also claims that a continuance should have been granted because the jurors had been exposed to pre-trial publicity.
A trial court has wide discretion in deciding whether to grant a continuance, and its exercise of discretion will not be reversed absent clear abuse. Watson v. State, Ala.Cr.App.,389 So.2d 961 (1980).
In the present case the record reflects that trial counsel had represented appellant at least as early as September 3, 1980, when Mr. Hughes appeared with her at arraignment. The record also reflects that appellant at least acquiesced in the postponement of the motion hearing set for December 10, and did not seek another setting for the matter prior to January 5.
Newspaper or other publicity does not, per se, constitute grounds for a continuance. Rogers v. State, Ala.Cr.App.,365 So.2d 322, 334 (1978). Each prospective juror in appellant's case was questioned regarding the effect of publicity, and appellant did not carry the burden of showing that the publicity had caused a prejudicial influence. See Williamson v.State, Ala.Cr.App., 370 So.2d 1054, affirmed, Ala.,370 So.2d 1066 (1978), vacated, 448 U.S. 903, 100 S.Ct. 3042,65 L.Ed.2d 1132 (1979).
Under these circumstances, we find no abuse of discretion in the denial of the motion for continuance filed January 5.
 IV
Appellant argues that the trial court erred by allowing the State to call Dennis Cross, an alleged accomplice and co-indictee with appellant, as a witness and to force Cross to invoke his fifth amendment privilege in the presence of the jury.
Prior to Cross' taking the witness stand, the district attorney had been informed by Cross' attorney that the witness intended to assert his privilege not to testify, and all parties (the State, appellant's counsel, and Cross' attorney) had informed the trial court of this fact in chambers. Appellant's counsel objected to Cross' being called as a witness before the jury and requested that the State question Cross in camera. The trial court denied the request for in camera interrogation of Cross and granted appellant a standing objection to the fact of Cross' being called as a witness in the presence of the jury. Dennis Cross then took the stand, testified to his name and age and the fact that he was presently under indictment for murder, but refused to answer the following questions propounded by the district attorney:
 "Q. Does that charge of murder stem from the homicide of Houston E. Busby?
"A. I refuse to answer.
"Q. Do you know a woman by the name of Marie Busby?
"A. I refuse to answer.
 "Q. Did you live in the home of Houston E. Busby during the period . . . approximate period of January 1, 1980 to May 1, 1980?
"A. I refuse to answer.
 "Q. On May the 14th of 1980, were you employed at the Busby sand and gravel pit in the Theodore area?
"A. I refuse . . .
 "Q. Have you ever been offered money to either murder Houston Busby yourself, or help someone else murder Houston Busby?
"A. I refuse to answer.
"Q. Do you know a man by the name of Terry Lewis?
"A. I refuse to answer.
"Q. Have you ever seen this weapon?
"A. I refuse to answer.
 "Q. Where were you at approximately five o'clock on the afternoon of May 13, 1980?
"A. I refuse to answer. *Page 843 
 "Q. Where were you at approximately 10, 10:30 P.M. on the night of May 13, 1980?
"A. I refuse to answer.
 "Q. During the early morning hours of May 14, 1980, did you have occasion to ride in a pickup truck to an area west of the Mobile Airport?
"A. I refuse to answer.
 "MR. HUGHES: Your Honor, if I might interpose an objection. It is clear that this man is not going to answer anybody's question, period. He has taken the Fifth Amendment. Mr. Galanos is using this for an opportunity to run through . . .
 "THE COURT: Well, I would want you to make a motion to the Court. I wouldn't want you to argue the case, Mr. Hughes. What is your motion to the Court?
"MR. HUGHES: I move Court for a mistrial.
"THE COURT: I deny your motion at this point.
 "Q. Mr. Cross, are you going to refuse to answer any additional question that I might ask you?
"A. Yes, sir.
"(Witness excused)."
Appellant contends that the State's questioning Cross when it knew beforehand that he would invoke the privilege against self-incrimination was an impermissible attempt to bolster its case against her by prejudicial inference rather than by probative fact.
In Namet v. United States, 373 U.S. 179, 83 S.Ct. 1151,10 L.Ed.2d 278 (1963), the United States Supreme Court addressed this issue and concluded that it is not always reversible error for the prosecution to call a witness whom it has reason to believe will refuse to testify based upon the Fifth Amendment. Each case must be examined on its own merits to determine whether, in light of all the surrounding circumstances, reversible error has occurred. In making this determination, the Court approved the test set out by lower federal courts using the following criteria:
 "First, some courts have indicated that error may be based upon a concept of prosecutorial misconduct, when the Government makes a conscious and flagrant attempt to build its case out of inferences arising from use of the testimonial privilege. This seems to have been one of the principal reasons underlying the finding of reversible error in United States v. Maloney, [262 F.2d 535 (2d Cir. 1959)]. In that case, the prosecution admitted knowing that two of its key witnesses could validly invoke the privilege against self-incrimination and intended to do so. The prosecutor nevertheless called and questioned them. The court also found that the Government's closing argument attempted to make use of the adverse inferences from their refusals to testify. See also United States v. Tucker, 3 Cir., 267 F.2d 212.
 "A second theory seems to rest upon the conclusion that, in the circumstances of a given case, inferences from a witness' refusal to answer added critical weight to the prosecution's case in a form not subject to cross-examination, and thus unfairly prejudiced the defendant. This theory seems also to have been present to some extent in the Maloney
decision, where the court noted that the challenged inferences were the only corroboration for dubious and interested testimony by the Government's chief witness. 262 F.2d, at 536-537. On the other hand, courts have failed to find reversible error when such episodes were `no more than minor lapses through a long trial.' United States v. Hiss, 185 F.2d 822, 832
(C.A.2d Cir.). See also United States v. Amadio, 215 F.2d 605, 614 (C.A. 7th Cir.). And even when the objectionable inferences might have been found prejudicial, it has been held that instructions to the jury to disregard them sufficiently cured the error."
Applying these factors to the case before us, we do not find, first, that the prosecution made "a conscious and flagrant attempt to build its case out of inferences" arising from Dennis Cross' refusal to testify. On the contrary, any inferences springing *Page 844 
from Cross' refusal to answer had already been established through the testimony of other witnesses. The most negative inference about the appellant no doubt arose from the witness' refusal to answer the following question: "Have you ever been offered money to either murder Houston Busby yourself, or help someone else murder Houston Busby?" Earlier, however, both Kenneth Ladner and Lynn Busby had testified that appellant referred to paying for the murder of her husband.
Thus, while Cross' failure to answer the State's question may have implicated the appellant, the effect of the implication was merely cumulative. It did not add "critical weight" to the prosecution's case nor was it the only source of corroboration for testimony by other State's witnesses. Furthermore, the district attorney's closing argument did not capitalize on, or even mention the inferences to be drawn from Cross' invoking his privilege against self-incrimination.
It is our judgment, therefore, that the innuendoes to be derived from the questions asked of Cross were "no more than minor lapses through a long trial." Namet, supra at 187,83 S.Ct. at 1155 (quoting United States v. Hiss, 185 F.2d 822, 832
(2d Cir. 1950)). See also Annot., 86 A.L.R.2d 1443 (1962). They supported no element of the State's case that had not already been amply established through previous testimony.
We note that this case does not involve the same situation present in Douglas v. Alabama, 380 U.S. 415, 85 S.Ct. 1074,13 L.Ed.2d 934 (1965). There, when a co-defendant refused to testify based on his privilege against self-incrimination, the State questioned him verbatim from his own out-of-court confession which implicated the defendant. The court reversed on the ground that the defendant had been denied his constitutional right of confrontation.
In contrast, the Supreme Court emphasized that the Namet case presented "no constitutional issues of any kind. . . . all that this case involves, in short, is a claim of evidentiary trial error." 373 U.S. at 185, 83 S.Ct. at 1154. Thus, the defendant in Douglas was denied a constitutional right because he was unable to cross-examine the actual content of a confession paraded before the jury in the guise of questions by the district attorney.
Here, appellant was not denied any constitutional guarantee. While she may have been prejudiced by the inferences arising from Cross' failure to answer the State's questions, that prejudice was cumulative in view of other evidence. Thus, as inNamet, this case turns on a question of evidence only.
We do not believe, under all the circumstances presented here, that the trial judge committed reversible error by allowing the prosecution to question Cross within the presence of the jury.
 V
Appellant maintains that the court erroneously refused her written requested charge number eight which stated, in pertinent part, "The assertions of counsel are not evidence."
The refusal of this charge is not always error; unless the prosecuting attorney has made improper argument, the trial court is not required to instruct the jury that the assertions of counsel are not evidence. Lamar v. State, Ala.,356 So.2d 680 (1977).
Immediately before both sides began their summations, the court stated the following to the jury:
 "It is very important, and I have told you earlier that the statements by the attorneys and opening statements, and then their closing summations is not evidence, but what they say may be very helpful in going through the evidence, and may enable you to put certain factors together and may be of tremendous benefit to you, but the law tells me that you cannot consider that as evidence. The evidence being either physical, documentary or testimony of the witnesses that you have heard." *Page 845 
The refusal of a written requested charge is not error if the subject matter is fully and substantially covered in the court's oral charge. Allred v. State, Ala.Cr.App.,390 So.2d 1109, cert. denied, Ala. 390 So.2d 1114 (1980); Ala. Code §12-16-13 (1975). Although the foregoing admonition to the jury was not contained in the court's final charge, in our judgment the cautionary instruction, placed as it was immediately prior to closing arguments, effectively explained to the jury what they could and could not consider as evidence in the case. For this reason, we find no error in the refusal of appellant's requested charge number eight.
 VI
Appellant also asserts that the refusal of the following requested charge was error.
 "I charge you, members of the jury, that if you have a reasonable doubt of the defendant's guilt growing out of the evidence of any part of it, you must acquit her."
Refusal of the above charge is not error if the matter is substantially covered in the court's oral charge. Carpenter v.State, Ala.Cr.App., 400 So.2d 417, cert. denied, Ala.,400 So.2d 427 (1981); Pride v. State, Ala.Cr.App., 392 So.2d 1215
(1980), cert. quashed, Ala., 392 So.2d 1219 (1981); Fitch v.State, Ala.Cr.App., 372 So.2d 1328 (1979).
We have examined the entire oral charge and we note that the court painstakingly covered every aspect of the law regarding reasonable doubt, and that the matter complained of was specifically covered by the following instruction:
 "You may have reached a reasonable doubt by virtue of some portion of the evidence, if you have considered all of the evidence."
The refusal of the charge was not error. Bates v. State, Ala.Cr.App., 405 So.2d 1334, cert. denied, Ala., 405 So.2d 1339
(1981).
We have searched the record for error prejudicial to appellant and have found none. The judgment and conviction by the Mobile Circuit Court is therefore affirmed.
AFFIRMED.
All the Judges concur.