Marie Lancaster BUSBY, Petitioner-Appellant,

v.

Kathleen B. HOLT, Warden; Charles A. Graddick, Attorney General of the State of Alabama, Respondents-Appellees.

No. 84–7110.

United States Court of Appeals, Eleventh Circuit.

Sept. 24, 1985.

**1462**

W. Gregory Hughes, J. Jerry Pilgrim, Mobile, Ala., for petitioner-appellant.

James F. Hampton, Sp. Asst. Atty. Gen., Montgomery, Ala., for respondents-appellees.

Before GODBOLD, Chief Judge, CLARK, Circuit Judge, and THOMAS *, District Judge.

PER CURIAM:

The petitioner, Marie Lancaster Busby, was convicted and sentenced in an Alabama state court to life imprisonment for the murder of her husband. Her conviction was affirmed on appeal by the Alabama Criminal Court of Appeals, 412 So.2d 837 (1982). She filed in federal court a petition for the writ of habeas corpus, claiming that the questioning of a co-indictee Dennis Cross by the prosecutor constituted prosecutorial misconduct in violation of her right to due process and also violated her right, under the Sixth Amendment, to confront and cross-examine the witness against her. The magistrate recommended granting the writ of habeas corpus because the petitioner's conviction was secured in contravention of her rights under the Sixth Amendment. The district court denied the writ finding that the record failed to support petitioner's claim of prosecutorial misconduct and that the invocation of the Fifth Amendment privilege by the witness neither had a substantial effect nor added critical weight to the state's case. We have withheld the decision of this case awaiting the en banc opinion of this court in *Brooks v. Kemp*, 762 F.2d 1383 (11th Cir.1985) (en banc), and a ruling on a second petition for rehearing en banc which has been denied.

---

* Honorable Daniel H. Thomas, U.S. District Judge for the Southern District of Alabama, sitting by designation.

## I. FACTS

The testimony at trial showed that the deceased was a violent man and that several people could have had a motive for killing him.[1]

Donna and Tonya Busby testified about the occurrences on the day of the murder. Donna Busby, the petitioner's thirteen-year-old daughter, stated that she was dating Dennis Cross at the time of her father's death. The Alabama court described her testimony as follows:

> On the afternoon of his death Houston Busby and his stepdaughter Tonya had a disagreement during which Houston called Tonya a "whore." The deceased also cursed his wife, the [petitioner]. Donna testified that during the afternoon and evening both Tonya Busby and Terry Lewis were angry at the deceased. After dinner Donna Busby had a conversation with Dennis Cross during which she learned of a plan to kill Houston Busby. Donna Busby then went to bed and did not awake until 6:15 the next morning. She learned from Dennis Cross at that time that Houston Busby had been killed. She said that she hated her father and was glad he was dead because he had abused her mother, brother and sister for so long. She stated that her parents had kept large amounts of cash in a black money pouch for as long as she could remember.

Tonya Busby, the deceased's fourteen-year-old stepdaughter, testified that she was engaged to Terry Lewis. On the day of Houston Busby's murder she and her stepfather had an altercation and he called her a "whore" within the hearing of Terry Lewis. Lewis then had a conversation with Dennis Cross after which he told Tonya, "It is going to happen tonight." Tonya stated that Lewis had threatened to kill Houston Busby on prior occasions when he learned that Busby had abused her, and she did not believe

---

1. For a detailed factual account of the trial, *see Busby v. State,* 412 So.2d 837 (Ala.Crim.App. 1982).

he was going to kill her stepfather that night. Miss Busby stated that Houston had beaten her and tried to rape her and she was glad he was dead.

On the night of the murder Tonya went to bed at 10:00 P.M., but woke up around midnight when she heard what sounded like a truck outside the house. She walked out of her bedroom and saw the [petitioner], her mother, and a bloody mess in the master bedroom. She did not see her stepfather. Her mother told her to start cleaning up and she complied. Tonya testified that Ladner, Cross and Lewis left the house and she and her mother then went back to bed.

*Busby v. State*, 412 So.2d 837, 840 (Ala. Crim.App.1982). The most detailed description of the murder came from the testimony of Kenneth Ladner, the petitioner's son and the deceased's stepson.

Kenneth Ladner, appellant's son and the deceased's stepson, testified that on several occasions prior to Houston Busby's death, he had heard his mother discuss paying to have Busby killed. Ladner said that the discussions took place in the presence of Terry Lewis and Dennis Cross and occurred after his mother had been beaten by his stepfather. Ladner stated that on May 13, 1980, Terry Lewis borrowed his rifle.... Ladner testified that when he loaned the gun to Terry Lewis he had an idea that Lewis was going to kill Houston Busby.

When Ladner returned home after midnight on March 14, 1980, he did not see Houston Busby, but he found his mother, Tonya Busby, Terry Lewis and Dennis Cross cleaning up bloody bedding in the master bedroom. [The Petitioner] told Ladner to watch from the window to see if anyone was coming. According to Ladner, the [petitioner] instructed the others to put bricks into garbage bags with the blood-stained bedding. Ladner said that he, Cross and Lewis then drove to a bridge near the Mississippi State line and threw the garbage bags and rifle into the water.

On cross-examination, Ladner said that he did not take his mother seriously when she mentioned having her husband killed and he did not think Lewis or Cross believed she was serious either. He admitted that he hated and feared his stepfather, whom he described as six feet, three or four inches tall and weighing 230 pounds, because Busby had beaten him before. Ladner said that his mother had always carried large sums of money and it was not unusual for her to have $14,000 in the black pouch.

*Id.* at 839.

In addition to the foregoing Ladner testified that about two months before the murder he had a conversation with his mother as follows:

Q. What did she say to you?

A. She asked me, did I know anybody that would kill him for $10,000, after she had been beaten.

Q. And that was between, you say, the four month and two month statement, is that correct?

A. Yes, sir.

Q. On a later occasion, did your mother come back to you and ask you if you had found somebody?

A. Yes.

Q. How much time had passed when she asked you if you knew somebody who would kill Houston Busby, until she asked you, "Have you found somebody?"

A. It was about a month or six weeks, or something like that. I don't remember exactly.

R. 372. The Court of Appeals of Alabama summarized the testimony of a witness who had previously been married to Houston Busby, Jr., but at that time was divorced, which summary is as follows:

Lynn Busby, appellant's former daughter-in-law, testified that about six weeks prior to Houston Busby's death appellant told her that she had talked with a man about having her husband "taken care of." Later, on the night before the murder, appellant told Ms. Busby that if Houston "laid a hand on her" it would be "the last chance he would have." Ac-

cording to the witness, appellant stated that there was a price for having her husband killed and she would be willing to pay it. On cross-examination, Ms. Busby acknowledged that she had seen appellant bruised and swollen on several occasions. She also stated that appellant and Houston Busby were in the habit of carrying large sums of cash and she had previously seen appellant with a black pouch of money.

412 So.2d at 839.

Marie Busby testified in her own behalf that she had lived with Houston Busby for fourteen years and they had one child, Donna. Her husband physically abused her at least three times a week and threatened to kill her if she ever left him. She stated that she had never made an offer of money to anyone to have her husband killed. She admitted that, after a beating, she may have said she wished he were dead, or she would give $10,000 to have him killed, but she did not intend for anyone to take her seriously.

The [petitioner] testified that on the night of her husband's death she cleaned up in the kitchen and her husband retired for the evening. Then she went to take a shower and while she was in the bathroom she heard what sounded like a gunshot. She put on her robe and started out of the bathroom when Terry Lewis appeared at the door with a gun in his hand said "You don't want to come out now." She was scared and she stayed in the bathroom crying until Lewis returned and told her to come out. Lewis then informed her that Busby was dead.

[The petitioner] stated that she was afraid her daughter Tonya had helped Lewis kill Busby and all of her ... further actions that night and the following day were done in an effort to protect her daughter. [The petitioner] admitted cleaning up the bedroom but denied planning to have her husband killed. She

denied telling Lynn Busby about a plan to pay for her husband's murder. *Id.* at 840.

Two character witnesses testified as to the petitioner's good reputation for truthfulness and peacefulness and one recalled that he had seen her come to work with black eyes and bruises at various times. Another witness testified that he had lived with the Busbys for five years during which "he saw the deceased abuse the [petitioner] and her children and he himself had also been beaten by the deceased." *Id.* at 840.

### A. The Colloquy Between the Court and Counsel

During the trial, the prosecutor insisted that Dennis Cross and Terry Lewis, who were both co-indictees be permitted to take the witness stand. Dennis Cross and Terry Lewis had been charged with first degree murder but neither had been tried. The defense had no advance notice of the prosecutor's intent to call them to the stand. The state called Cross to the stand but did not call Lewis.

Defense counsel adamantly objected and requested the court to instruct the state not to call the witnesses because: (1) there was a reasonable expectation they would assert the Fifth Amendment as both witnesses were charged with first degree murder; and (2) the exercise of their rights not to testify would be highly prejudicial. In the alternative, defense counsel argued that the court should allow the witnesses to take the stand out of the presence of the jury.[2]

The prosecutor maintained that the state had an absolute right to call the witnesses in the presence of the jury. First, he argued that the jurors, as lay people, would not understand the "legal ramifications" involved, *i.e.*, that the witnesses were charged with murder and that they could assert their rights under the Fifth Amendment if called to testify. It was urged that the jurors had "a right to know that the

---

**2.** *Record* Volume III at 482–83.

State [had] the good sense to at least call them." [3]  Second, it was asserted that defense counsel could comment on the failure of the state to call the witnesses during his closing argument if the witnesses were not called before the jury.  Last, the state maintained that as eyewitnesses to the crime the testimony of the witnesses could be highly relevant.

Next, the court heard arguments from Dennis Cross's counsel.  He advised the court that Cross's case had arisen from the same transaction and that his trial was pending.  He also stated that Cross would assert the Fifth Amendment if called to testify.[4]

Thereafter, another discussion occurred between the court and counsel in which defense counsel repeated his objections.  During this discussion, the prosecutor addressed the subject of prosecutorial misconduct and conceded that this case presented "a close question." [5]

In ruling on the objections, the court stated:

> The question that bothers the Court is the right of the State Government ... in [sic] the duty of the District Attorney's office to present all of the evidence that is available, or anyone who might testify who would lead ... give probative testimony, who would be someone who might present evidence that would be enlightening to the jury.

*Record* Volume III at 507.  The court ruled that the prosecutor had the right to interrogate the witnesses in the presence of the jury but ·granted defense counsel a standing objection.[6]

**3.** *Id.* at 486.

**4.** *Id.* at 486, 506.

**5.** The prosecutor stated:
> The law on the question is concededly very close.
> . . . .
>
> The bottom line, Judge, is that it is a close question. . . .  The law, as I read it says, that we are allowed to put Dennis Cross and Terry Lewis on the stand, even if we know that they

## B.  *The Interrogation of Dennis Cross*

Dennis Cross was called to the stand in the presence of the jury.  Prior to being interrogated by the prosecutor, Cross was examined by the trial judge and counseled by him with respect to his Fifth Amendment right not to answer questions which would tend to incriminate him.  Cross was examined as follows by the prosecutor:

Q.  Did you say, sir, that your name is Dennis Brinson Cross, Jr.?

A.  Yes, sir.

Q.  How old are you, sir?

A.  I just turned 19 in December.

Q.  Mr. Cross, are you presently under indictment in this Court for the offense of Murder?

. . . .

A.  Yes, sir.

Q.  Does that charge of murder stem from the homicide of Houston E. Busby?

A.  I refuse to answer.

Q.  Do you know a woman by the name of Marie Busby?

A.  I refuse to answer.

Q.  Did you live in the home of Houston E. Busby during the period ... approximate period of January 1, 1980 to May 1, 1980?

A.  I refuse to answer.

Q.  On May the 14th of 1980, were you employed at the Busby sand and gravel pit in the Theodore area?

A.  I refuse ...

Q.  Have you ever been offered money to either murder Houston Busby

will take the Fifth.  Because, A., no prosecutorial misconduct, and B., no inferences would be drawn from a witness' refusal to answer which would add critical weight.  By inference there, we are talking about a prosecutor in a closing argument getting up and ranting and raving about, he took the stand, he took the Fifth.
*Id.* at 503–05.

**6.** *Id.* at 511.

yourself, or help someone else murder Houston Busby?

A. I refuse to answer.

Q. Do you know a man by the name of Terry Lewis?

A. I refuse to answer.

Q. Have you ever seen this weapon?

A. I refuse to answer.

Q. Where were you at approximately five o'clock on the afternoon of May 13, 1980?

A. I refuse to answer.

Q. Where were you at approximately 10 or 10:30 p.m. on the night of May 13, 1980?

A. I refuse to answer.

Q. During the early morning hours of May 14, 1980, did you have occasion to ride in a pickup truck to an area west of the Mobile Airport?

A. I refuse to answer.

. . . .

Q. Mr. Cross, are you going to refuse to answer any additional question that I might ask you?

A. Yes, sir.

*Id.* at 513–15.

After the prosecutor had asked these questions, the interrogation was interrupted by defense counsel's objection. Defense counsel moved for a mistrial but the motion was denied. No further questions were asked of Dennis Cross. The subject of Cross being interrogated was not again addressed or mentioned during the trial.

## C. *Information Before the Jury*

While the jury panel was being assembled, the indictment was read. The indictment provided that the petitioner Marie Busby had:

[C]aused Houston Busby to be killed with a rifle pursuant to an agreement or contract for hire, to wit, an agreement or promise to pay Terry Lewis and Dennis Cross the approximate sum of $10,000 to kill the said Houston Busby. The said Terry Lewis and Dennis Cross, pursuant to said contract or agreement ... did ... kill Houston Busby by shooting him with a rifle in violation of ... the Code of Alabama.

*Supplemental Transcript* at 4. The prosecutor also read the indictment to the jury during his opening statement. In addition, he discussed the theory of the case, *i.e.* that Mrs. Busby induced the murder by offering money.[7] He pointed out that he expected the evidence to show that: (1) on more than one occasion, Marie Busby offered Lewis and Cross money to kill Houston Busby; (2) on May 13, Lewis and Cross went to a dirt pit owned by Houston Busby and acquired a rifle from Mrs. Busby's son by a previous marriage; (3) Lewis and Cross proceeded to the Busby home with the rifle and stayed there until Houston Busby went to bed; (4) while Houston Busby was asleep, Lewis and Cross went to his bedroom and shot him; (5) after the murder was committed, Lewis and Cross transported Houston Busby's body to another area; and (6) Cross and Lewis returned to the Busby home and with the assistance of Mrs. Busby cleaned up and disposed of the evidence of the crime.[8]

Defense counsel also discussed the state's theory in his opening statement and explained that Cross was a boyfriend of Mrs. Busby's daughter and that he had moved out shortly before the shooting. Defense counsel stated he expected the evidence to show that Cross was at the house the day Houston Busby was killed.[9]

As mentioned previously, the jury heard testimony on approximately three or four occasions that Cross had dated Mrs. Busby's daughter, lived in the house, worked at the gravel pit owned by Houston Busby, and had a murder charge that stemmed

---

**7.** The prosecutor stated: "The theory of the prosecution is that an offer was made to Cross, to Lewis, pursuant to that offer, that these two kids ... then went and killed Houston Busby." *Supplemental Transcript* at 69–70.

**8.** *Id.* at 70–71.

**9.** *Id.* at 75–78.

from the homicide of Houston Busby. There was also testimony that he had seen the murder weapon and was at the Busby house the night of the murder.

Kenneth Ladner, Mrs. Busby's son, affirmatively testified that he had heard his mother tell Cross and Lewis that she would give $10,000 to have Houston Busby killed. He stated that on each of these occasions Busby had just previously beaten his mother, which was evidenced by facial bruises, a black eye, and one time by her dental plate being bent so that it did not "fit her right after then." He said the last of these conversations was six weeks to two months before Busby was killed.[10] He stated that he did not take his mother seriously when she mentioned having her husband killed and "he did not think Lewis or Cross believed she was serious either."[11] Lynn Busby, who had previously been married to Houston Busby's son, also testified that the petitioner had discussed having her husband killed.[12] Neither Donna nor Tonya Busby affirmatively testified that they had heard their mother discuss paying money to anyone to have Houston Busby killed.[13] The defendant, Marie Busby, testified that she never intended her statements to be taken as an offer to have her husband killed.[14]

Neither the prosecutor nor defense counsel referred to Cross's answers to the prosecutor's questions in their closing argument. In addition, defense counsel did not request (and the court did not give) a curative instruction concerning the inferences to be drawn from Dennis Cross's invocation of the privilege.

## II. THE INQUIRY

Our task is to determine if petitioner's constitutional rights were abridged as a result of the prosecutor's actions in interrogating Dennis Cross as just described.

Two constitutional rights are implicated: (1) Petitioner's right to a fundamentally fair trial under the due process clause; and (2) Petitioner's right under the Sixth Amendment to confront witnesses called by the state and cross examine them.

Petitioner contends that the state attorney was guilty of prosecutorial misconduct when he intentionally put Dennis Cross on the stand knowing that he would not answer the questions asked of him, and that such misconduct deprived her of a fundamentally fair trial. She further contends that she was deprived of the opportunity to cross-examine Dennis Cross and dispel the adverse inferences created against her by the questions propounded.

Turning first to the prosecutorial misconduct claim, we call attention to our recent opinion in *Brooks v. Kemp*, 762 F.2d 1383 (11th Cir.1985) (en banc), petition for rehearing en banc denied. In *Brooks*, we acknowledged that while fundamental fairness is the relevant standard in a prosecutorial misconduct case, further tests are necessary to guide us in resolving particular cases. *Id.* at 1400. In *Brooks*, we adopted the prejudice requirement which was set out in *Strickland v. Washington*, —— U.S. ——, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), an ineffective assistance of counsel case. We quoted the prejudice standard from *Strickland v. Washington* as follows:

> The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

*Brooks, supra* at 1401 (quoting from *Strickland*). Further on that same page of our opinion we stated that the inquiry is "whether the absence of improper argu-

---

**10.** *Record* Volume II–III at 371, 412, 415.

**11.** *Busby v. State,* 412 So.2d at 839.

**12.** *Record* Volume III at 491–93. She also acknowledged that she had seen the petitioner bruised and swollen on several occasions.

**13.** *Id.* at 595.

**14.** *Record* Volume IV at 643–44.

ment would have, in reasonable probability, changed the result...." *Id.*

We have the problem of determining whether *Brooks* controls our opinion in this case. *Brooks* involved an alleged prosecutorial argument based upon an improper or impermissible argument to the jury in the sentencing phase of a death case. In *Brooks,* we stated that "a permissible argument no matter how 'prejudicial' or 'persuasive' can never be unconstitutional." *Id.* at 1403. The opinion then went on to state that we had to undertake an examination of the argument to determine whether all or parts of it constituted an impermissible or egregious argument which created a reasonable probability that the outcome was changed because of them. *Id.* at 1403. In the present case the claimed prosecutorial misconduct is not related to the prosecutorial argument to the jury but to the intentional calling of Dennis Cross for the purpose of prejudicing the petitioner. We conclude that we are bound by *Brooks* even though, here, there is a different type of prosecutorial misconduct. We turn to the fundamental fairness test to determine whether the absence of the examination of Dennis Cross by the prosecutor would have, in reasonable probability, changed the outcome of the case.

Before examining the questioning of Dennis Cross and its probable impact on the outcome of this case, we turn to the second constitutional principle involved, and that is petitioner's right under the Sixth Amendment to have cross-examined Dennis Cross. Two Supreme Court cases assist us in this analysis. While not discussing constitutional issues, the Supreme Court first addressed the facts similar to those presented here in *Namet v. United States,* 373 U.S. 179, 83 S.Ct. 1151, 10 L.Ed.2d 278 (1963). In *Namet,* the appellant claimed that reversible error was committed when the government was permitted to question witnesses when it was known that they would assert their privilege not to

answer. Warning that reversible error is not invariably committed whenever a witness claims his privilege not to answer, the Supreme Court pointed out that there are two principles that suggest that a witness' invocation of the privilege constituted error. First, error "may be based upon a concept of prosecutorial misconduct, when the Government makes a conscious and flagrant attempt to build its case out of inferences arising from the use of the testimonial privilege." *Id.,* 83 S.Ct. at 1154–55. Second, error may occur where "inferences from a witness' refusal to answer added critical weight to the prosecution's case in a form not subject to cross-examination, and thus unfairly prejudiced the defendant." *Id.* at 1155. *Namet,* also pointed out that reversible error does not occur where the event in question was no more than a minor lapse through a long trial or where the claims of privilege were at most cumulative support for an inference well established by nonprivileged testimony. *Namet v. United States,* 373 U.S. at 187, 189, 83 S.Ct. at 1154–55.[15] These principles have constitutional significance and are applicable to the states. *Rado v. Connecticut,* 607 F.2d 572, 581 (2d Cir.1979), *cert. denied,* 447 U.S. 920, 100 S.Ct. 3009, 65 L.Ed.2d 1112 (1980).

Courts have considered several factors in applying the *Namet* test. Some of these are: (1) the prosecutor's intent in calling the witness; (2) the number of questions asked that elicit an assertion of the privilege; (3) whether the adverse inferences drawn from the assertion of the privilege relate to central issues or collateral matters; (4) whether the inference is the only evidence or is merely cumulative of other evidence; (5) whether the witness is closely associated with the accused; (6) whether defense counsel objects; (7) whether the prosecutor attempts to draw adverse inferences from the witness' refusal to testify in his closing argument; (8) whether defense counsel has relied on the assertion of the privilege; and (9) whether the trial judge

---

15. In *Namet* defense counsel failed to object. Additionally, the witnesses were co-defendants who had pled guilty and claimed their fifth amendment rights only to a portion of their testimony.

gives a curative instruction. *See Zeigler v. Callahan*, 659 F.2d 254, 272 (1st Cir.1981); *Rado v. Connecticut*, 607 F.2d at 581; *United States v. Ritz*, 548 F.2d 510, 518–20 (5th Cir.1977).

The Supreme Court in *Douglas v. Alabama*, 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965) reversed the affirmance of a conviction by the Supreme Court of Alabama where the prosecutor had placed a co-defendant on the stand and interrogated him about a confession he had made which implicated defendant Douglas. Because the co-defendant exercised his Fifth Amendment right not to testify, Douglas was thus denied the right to cross-examine.

▪ There is no doubt that a defendant in a criminal trial has a fundamental constitutional right to cross-examine witnesses called by the state, and this constitutional right has been equated to the right to notice and an opportunity to be heard and the right to counsel. *See Pointer v. Texas*, 380 U.S. 400, 404–05, 85 S.Ct. 1065, 1068, 13 L.Ed.2d 923 (1965); *Brookhart v. Janis*, 384 U.S. 1, 3, 86 S.Ct. 1245, 1246, 16 L.Ed.2d 314 (1966); *Smith v. Illinois*, 390 U.S. 129, 131, 88 S.Ct. 748, 749, 19 L.Ed.2d 956 (1968); *Chambers v. Mississippi*, 410 U.S. 284, 294–95, 93 S.Ct. 1038, 1045, 35 L.Ed.2d 297 (1973). In speaking to the extent of this right, the Supreme Court in *Smith v. Illinois, supra,* said:

> Even more recently we have repeated that "[a] denial of cross examination without waiver ... would be constitutional error of the first magnitude no amount or showing of want of prejudice would cure it." *Brookhart v. Janis*, 384 U.S. 1, 3, 86 S.Ct. 1245–46, 16 L.Ed.2d 314 (1966).

*Smith v. Illinois*, 390 U.S. at 131, 88 S.Ct. at 750.

The test was lessened slightly in *Chambers v. Mississippi, supra,* where the Supreme Court said:

> Of course, the right to confront and to cross-examine is not absolute and may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process. *E.g., Mancusi v. Stubbs,*

408 U.S. 204, 92 S.Ct. 2308, 33 L.Ed.2d 293 (1972). But its denial or significant diminution calls into question the ultimate "integrity of the fact finding process" and requires that the competing interest be closely examined. *Burger v. California*, 393 U.S. 314, 315, 89 S.Ct. 540, 541, 21 L.Ed.2d 508 (1969).

*Chambers v. Mississippi, Id.,* 410 U.S. at 295, 93 S.Ct. at 1046.

▪ There is no question but that petitioner Busby was denied the right of confrontation and effective cross-examination of Dennis Cross by his invocation of his privilege not to testify. A witness is not available for full and effective cross-examination when he or she refuses to testify. *Douglas v. Alabama*, 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965); *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968); *Nelson v. O'Neil*, 402 U.S. 622, 91 S.Ct. 1723, 29 L.Ed.2d 222 (1971). Since it appears that the petitioner was denied her Sixth Amendment right of confrontation, the question is what test should be applied in determining the effect of the constitutional deprivation upon the petitioner. The Supreme Court has not specifically applied *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) to a denial of a defendant's right of confrontation.

▪ We have faithfully attempted above to set forth the clearest statements of the Supreme Court concerning its opinion of the importance of this constitutional right. Our review indicates that the Sixth Circuit in *Mayes v. Sowders*, 621 F.2d 850, 856 (6th Cir.1980) did apply *Chapman v. California, supra.* The court said:

> Having found constitutional error, we must next assess "whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction" or whether the error can be declared to be "harmless beyond a reasonable doubt."

621 F.2d at 856 (citing *Chapman v. California, supra*). Since the *Chapman v. California* test is the one most frequently

used in assessing the weight of constitutional error, we adopt that standard.

■ We normally would be troubled by considering a case where different tests were required in the assessment of two constitutional errors. The interrogation of Dennis Cross by the prosecutor in the presence of the jury presents to us the two constitutional issues previously described, alleged prosecutorial misconduct and deprivation of a defendant's right of confrontation. However, since the *Chapman v. California* test invokes a higher standard than does the *Brooks v. Kemp* test, and since we find that the action of the prosecutor here in denying the petitioner the right of confrontation is harmless beyond a reasonable doubt, we conclude that there is no reasonable possibility that the interrogation of Dennis Cross might have contributed to the conviction of the defendant. Thus, finding that the district court should be affirmed in light of the severer of the two tests, we hold that even if the prosecutor had been guilty of prosecutorial misconduct, there would be no basis for reversal under the lesser *Brooks v. Kemp* standard.

Our reasons for concluding that the interrogation of Dennis Cross could not have contributed to the conviction of petitioner are the same as those reached by the district court. The only question in the interrogation that could have prejudiced the defendant at trial was: "Have you ever been offered money to either murder Houston Busby yourself, or help someone else murder Houston Busby?" Any implication that the defendant might have offered to pay Cross for killing her husband would have been cumulative to evidence already admitted.

Additionally, although Marie Busby was charged with the capital offense of murder for hire, the jury returned a verdict for the lesser offense of murder. Consequently, any inference from the question implicating Marie Busby for offering to pay Dennis Cross money to kill Houston Busby was harmless beyond a reasonable doubt.

Accordingly, we affirm the decision of the district court.

AFFIRMED.

CLARK, Circuit Judge, dissenting:

I respectfully dissent. The decision in this case turns on whether the prosecutorial misconduct and the denial of the petitioner's right of confrontation had an effect upon the jurors' deliberations to the extent that the verdict might have been different but for the incident surrounding the interrogation of Dennis Cross. Utilizing the standard promulgated by the Supreme Court in *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), a court is required to assess whether there is a reasonable possibility that the interrogation of Dennis Cross might have contributed to the conviction or whether the error complained of can be declared to be harmless beyond a reasonable doubt.

According to the majority, the test used in assessing the prosecutorial misconduct is that adopted by our court in *Brooks v. Kemp,* 762 F.2d 1383 (11th Cir.1985), which requires the petitioner to demonstrate that there is a reasonable probability that the constitutional error changed the outcome of the case. Recently the Supreme Court in *Caldwell v. Mississippi,* — U.S. —, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), used a different approach. In reversing a Mississippi conviction, the Court evaluated the impact of the prosecutor's improper argument at the penalty phase of Caldwell's trial as follows:

> Because we cannot say that this effort [to minimize the jury's responsibility for determining the appropriateness of the death penalty] had *no effect on the sentencing decision,* that decision does not meet the standard of reliability that the Eighth Amendment requires.

*Id.,* 105 S.Ct. at 2646.[1] The language used by the Court in *Caldwell* is essentially a

---

1. Admittedly, *Caldwell* was an Eighth Amendment decision. The Eighth Amendment is not applicable in this case. Nevertheless, the lan-

guage used by the Court points, implicitly, to maintaining the use of the harmless error test and not the *Strickland v. Washington,* 466 U.S.

paraphrase of the harmless error test of *Chapman, supra.*[2]

Regardless of which test is applied in this case, the writ of habeas corpus should be granted. There is a reasonable possibility that the outcome of the case could have been different if the state trial court had not permitted the interrogation of Cross. Certainly, it cannot be said that the interrogation of Cross "had no effect on the decision," and it is impossible to conclude that there is no reasonable possibility that the interrogation of Cross might not have contributed to Ms. Busby's conviction, under the *Chapman* test. Before giving reasons for reaching a different conclusion than the majority with respect to the confrontation issue, the issue of prosecutorial misconduct merits brief discussion.

### Prosecutorial Misconduct

It is not difficult to determine the prosecutor's intent in this case. From his discussion, it is clear that he was aware his actions presented a "close question," in this area of the law. In addition, there was no reason for not calling the witness outside the presence of the jury. The prosecutor persisted in urging that the witness be permitted to assert the privilege in the presence of the jury. His rationale was to prevent speculation by the jury regarding the state's failure to call an important witness and to prevent the defense from commenting on this failure in his closing argument. His interrogation of Cross permitted the jury to speculate regarding defense counsel's failure to cross-examine this important witness. The prosecutor's dilemma could have been solved in two ways. The trial court could have required defense counsel to refrain from arguing the state's failure to call Cross and Lewis. Secondly, the prosecutor could have called them to the stand in the presence of the jury and

asked them simply whether they would exercise their Fifth Amendment rights if questioned about Houston Busby's murder. Defense counsel had no solution to his dilemma.

There is no question but that the prosecutor intended to prejudice the defendant when he asked Cross "Have you ever been offered money to either murder .Houston Busby yourself, or help someone else murder Houston Busby?" In *Shockley v. State*, 335 So.2d 659 (Ala.Ct.Crim.App. 1975), *aff'd*, 335 So.2d 663 (1976), the court in reversing a conviction commented:

> [T]he prosecutor's persistent confrontation of the witness, Irons, with multiple questions, approximately twenty-five in number, even though the prosecutor was informed in camera, and also after the questioning had begun, that Irons would not testify, supports a *reasonable inference that the prosecution preferred to parade these questions before the jury, thereby impressing them with innuendoes and inferences of guilt prejudicial to defendant.*

*Id.* at 662 (emphasis added). This is exactly what occurred in this case. It should be noted that when the Alabama Court of Appeals affirmed this case, it made no reference to its prior decision in *Shockley*. Nor did the prosecutor here call this case to the attention of the state trial judge.[3]

The prosecutor, in arguing that he had an absolute right to call the witness before the jury, relied on *Namet v. United States*, 373 U.S. 179, 83 S.Ct. 1151, 10 L.Ed.2d 278 (1963). However, in *Namet* the prosecutor did *not* know that the witness would claim the privilege, defense counsel did not object, the witness/co-defendants had already pled guilty, and only four questions were

---

668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), standard in evaluating Sixth Amendment claims of ineffective assistance of defendant's counsel.

2. For a more detailed explanation of the difference in the two tests, *see Brooks v. Kemp*, 762 F.2d 1383, 1431 (11th Cir.1985) (Clark, dissenting).

3. As mentioned in the majority opinion, the defense was given no advance notice by the prosecutor of his intended tactic, and there was no overnight recess during which defense counsel could research the issue.

asked in which the refusal to answer was sustained.

The former Fifth Circuit has indicated that in situations such as this, an in chambers hearing is the proper procedure for avoiding prejudicial error. *United States v. Ritz,* 548 F.2d 510 (5th Cir.1977).[4] This is because "[t]here is nothing about the government's right to have a witness claim his privilege in response to specific questions while on the stand under oath *that requires it to be done in the presence of the jury." Id.* at 521 (emphasis added); *see also United States v. Martin,* 526 F.2d 485 (10th Cir.1975) (trial court did not err in refusing to permit an informant to be called to the stand and thus be compelled to invoke the privilege in the presence of the jury). Moreover:

> [A]n *interrogating official himself gravely abuses the privilege against self-incrimination when, believing a truthful answer will incriminate a witness, he nevertheless insists on asking the incriminating question* with a view to eliciting a claim of privilege and thereby creating prejudice against the witness or some other party concerned.

*United States v. Tucker,* 267 F.2d 212, 215 (3d Cir.1959) (emphasis added).

The district court indicated the "record failed to establish flagrant behavior on the prosecutor's part." *Busby v. Holt,* No. 82–0582–H, slip op. at 3 (Jan. 24, 1984). He relied upon the Alabama Court of Criminal Appeals statement in *Busby, supra,* 412 So.2d at 843: "... we do not find, first that the prosecution made 'a conscious and flagrant attempt to build its case out of inferences' arising from Dennis Cross' refusal to testify." The Alabama court was relying on *Namet, supra.* I agree with the Alabama court that the prosecutor was not trying to *build* his case based on the refusal of Cross to testify. At the same time, I am convinced that he was trying to prejudice the defendant's sole defense.

4. Under *Bonner v. City of Prichard,* 661 F.2d 1206 (11th Cir.1981) (en banc) all decisions of the former Fifth Circuit handed down before

There is no question but that defense counsel thoroughly raised appropriate objections to the prosecutor's efforts to interrogate Cross in the presence of the jury. The prosecutor here said in one place "The law on the question concededly is very close" (R. 503), and in another place "The bottom line, Judge, is that it is a close question, but the law is ... I will read it...." The prosecutor relied upon *Namet, supra,* and *Rado v. Connecticut,* 607 F.2d 572 (2d Cir.1979), *cert. denied,* 447 U.S. 920, 100 S.Ct. 3009, 65 L.Ed.2d 1112 (1980). He failed to cite to the court *Shockley v. State,* 335 So.2d 659 (Ala.Ct. Crim.App.1975), where his own state appellate court held: "The trial court committed error in permitting such interrogation, although no answers were made, if for no other reason than that the defendant under such tactics was denied confrontation, a right of cross-examination, assured under the Sixth Amendment to the United States Constitution." *Id.* at 662.

The prosecutor argued to the trial court that his reason for wanting to call Cross, notwithstanding the fact that Cross would refuse to answer the questions, was to inform the jury that the state had done all within its power to present testimony to the jury which was relevant to the crime. Faced with a similar problem, Judge Learned Hand in *United States v. Maloney,* 262 F.2d 535 (2nd Cir.1959), said the following:

> "We must confess that the situation is one in which either alternative results in prejudice to one side or the other; and it is impossible, so far as we can see, to lay down any general rule that will cover all instances. In the case at bar the prosecution knew that Parkhurst and Mascali would refuse to answer, and it seems to us that the interest of the accused should prevail over that of the prosecution, and that the judgment should not stand, for the questions touched vital elements of the charge."

October 1, 1981 will be followed by the Eleventh Circuit.

*Id.* at 537. I conclude that the actions of the state attorney amounted to prosecutorial misconduct which deprived the prisoner of her constitutional due process rights as well as her Sixth Amendment right to confrontation of witnesses presented to testify against her.

### The Confrontation Issue

In assessing harmless error a court reviews the evidence pointing to the guilt of the convicted defendant, excluding from consideration the evidence or factors that were erroneously injected in the case. If a court concludes that the jury's verdict would have been the same, and under *Chapman* the constitutional error could not have possibly contributed to the conviction because of the weight of the evidence pointing to guilt, a writ of habeas corpus will be denied. In *Harrington v. California*, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969), the Supreme Court discussed application of the *Chapman* constitutional harmless error test as follows:

> We do not depart from *Chapman;* nor do we dilute it by inference. We reaffirm it. We do not suggest that, if evidence bearing on all the ingredients of the crime is tendered, the use of cumulative evidence, though tainted, is harmless error. Our decision is based on the evidence in this record. The case against Harrington was not woven from circumstantial evidence. It is so overwhelming that unless we say that no violation of *Bruton* can constitute harmless error, we must leave this state conviction undisturbed.

*Id.* 395 U.S. at 254, 89 S.Ct. at 1728–29.

In my opinion the evidence of Mrs. Busby's guilt was not overwhelming. There was no testimony that Marie Busby and her husband Houston Busby had had any argument or problems on the day of the murder or in the period immediately preceding the murder. There was evidence that Houston Busby had physically mistreated his wife on a number of occasions and that Mrs. Busby had discussed her willingness to pay $10,000 to have her husband killed and that about six weeks prior to her husband's death she had allegedly talked with a man about "taking care of her husband."

There is no direct or indirect evidence that Mrs. Busby participated in the murder of her husband. She was in the house on the night of the murder and after the murder helped to clean up the house. Her uncontradicted testimony was that she was taking a shower and heard a gun fire.

On the other hand, the evidence showed that there were conversations during the late afternoon before Busby's murder during the night that Terry Lewis and Dennis Cross planned to kill Busby. Tonya Busby testified that Lewis and Cross had had a conversation after which he told Tonya: "It is going to happen tonight." (Majority Op., at 1462). Donna Busby also testified that she had a conversation with Dennis Cross during which she learned of the plan to kill Houston Busby that night. Kenneth Ladner testified that Terry Lewis borrowed his gun the evening of the murder and that he had an idea that Lewis was going to kill Houston Busby. The evidence is clear that Terry Lewis and Dennis Cross had reason to kill Houston Busby.

Mrs. Busby's defense was based on Cross' and Lewis' anger towards Busby growing out of the incidents during the afternoon before the killing. Additionally, she defended on the basis that the killing was not in any way related to any offer by her to have her husband killed. It is clear that the state was prosecuting Mrs. Busby on the theory that her role in the killing was that of a hirer of the killers. As pointed out in note 7 in the Majority Opinion the prosecutor in opening statements stated: "The theory of the prosecution is that an offer was made to Cross, to Lewis, pursuant to that offer, that these two kids ... then went and killed Houston Busby." *Supplemental Transcript* at 69–70. It was critical to the prosecutor's case that the jury be convinced that Marie Busby offered Lewis and Cross money to kill Houston Busby and that she was the instigator of the crime. The prosecutor called

Dennis Cross to the stand for the expedient of linking Cross to Mrs. Busby and an offer by her to kill Houston Busby. The critical question (Majority Op., at 1465) was: "Have you ever been offered money to either murder Houston Busby yourself, or help someone else murder Houston Busby?" to which Dennis Cross refused to answer.

The prosecutor argued to the court that the jurors would not understand the legal ramifications if he failed to call Dennis Cross and Terry Lewis to the stand. He urged that the jurors had a right to know that the state had the good sense to at least call them as witnesses. The unfortunate aspect is that the jury did not understand the failure of Mrs. Busby's defense attorney's to cross-examine Dennis Cross as he had other witnesses.[5] The jury had no way of knowing that defense counsel could not elicit such exculpatory testimony from Cross as counsel had previously brought out on cross-examination of Ladner and Lynn Busby.

Although it may be that Marie Busby employed Cross or Lewis to kill her husband and/or participated in the murder, I cannot conclude that there was no reasonable possibility that the interrogation of Cross did not contribute to her conviction. This case is similar to *United States v. Ritz*, 548 F.2d 510 (5th Cir.1977). In that case Robert Ritz, Sr., the parent of some of the defendants and the husband of one of them, was an unindicted co-conspirator who invoked the Fifth Amendment when being interrogated about the facts of the case. In *Ritz* there had already been considerable testimony on the subjects about which Robert Ritz, Sr. was questioned. The Fifth Circuit had the following to say:

> We have no doubt that this whole contretemps was in fact prejudicial to the defendants. It would be difficult to see how the average juror could fail to assume that the Government would not put

on the witness stand to testify against his wife and children any witness who did not have some pretty strong evidence to help the Government's case. Assuming as the jury should, that counsel, in seeking the father's testimony was acting in good faith with the idea that what he would say would be relevant and material in proving the guilty knowledge of the defendants, how could the jury feel otherwise than that if Robert Ritz, Sr. had answered his testimony might not only have placed him in jeopardy but would also have helped convict the four defendants.

. . . .

> Recognizing as we must, that the questions asked of Mr. Ritz were "superfluous" because there was other evidence available to the effect that the father did operate a body shop at his house and that he did give the $50 note to Robert Jr., we are at a loss to see any purpose for having this drama played out before the jury other than that of having the jury draw inferences from Robert Ritz, Sr.'s refusal to answer the questions. Such inferences are, of course, not permitted but they exist, as recognized by such cases as *United States v. Maloney*, 262 F.2d 535 (2d Cir.1959).

548 F.2d at 518-19.

The majority agrees that the critical question propounded to Dennis Cross was whether or not Marie Busby had offered him $10,000 to kill Houston Busby. The majority reasons that since the jury did not convict Marie Busby of capital murder for hire, the error is harmless. Marie Busby was charged with capital murder pursuant to a contract for hire under § 13-11-2(7), Code of Alabama 1975. The indictment alleged that she had agreed to pay one Terry Lewis and one Dennis Cross approximately $10,000 to shoot her husband, Hous-

---

5. The jurors had every right to expect defense counsel to cross-examine Cross about whether Mrs. Busby had participated in the murder, whether Cross and Lewis committed the crime for hire or whether they did it because of Bus-

by's mistreatment of Tonya to whom Cross was engaged. Instead of hearing cross-examination, they heard defense counsel object and move for a mistrial.

ton Busby. At closing arguments to the jury, the prosecutor argued: "It was a murder induced by the offer of money." The prosecutor further argued: "And based on the evidence, we ask that you find the defendant guilty as charged in the indictment, which is to say of capital murder. Because she was the motivating force, based on the evidence behind a cold blooded assassination." *Supplemental Transcript* at 94. The defense of Marie Busby was that the state had not proven that there was an agreement between Marie Busby and Dennis Cross and Terry Lewis to kill Houston Busby for $10,000. *Id.* at 100.

Under Alabama law the jury had to be instructed that it could return a lesser offense than that charged in the indictment, including offenses of murder and manslaughter. The jury's verdict of murder instead of capital murder does not mean the jury did not convict on the killing for hire theory. There was no other theory. Marie Busby's guilt turned on whether the night Houston Busby was killed the murder was committed by Dennis Cross and Terry Lewis as a consequence of Marie Busby's offer of $10,000. The misconduct of the prosecutor in calling Dennis Cross to the stand and the error of the trial judge in permitting the cross-examination of Dennis Cross permitted the jury to infer that Marie Busby had indeed offered $10,000 to Dennis Cross to commit the crime. Defense counsel was denied the right to cross-examine Cross to dispel any such inferences. I would grant the writ so that Marie Busby could have a fair trial without the taint of such a prejudicial proceeding which leaves unknown what contributory effect it had upon the decision of the jury.